513 So.2d 265 (1987)
STATE of Louisiana
v.
Curtis L. KYLES.
No. 86-KA-0880.
Supreme Court of Louisiana.
September 9, 1987.
Concurring Opinion September 11, 1987.
Rehearing Granted in Part; Denied in Part October 15, 1987.
*267 William J. Guste, Jr., Atty. Gen., Harry F. Connick, Dist. Atty., Mike McMahon, Asst. Dist. Atty., for plaintiff-appellee.
Martin Regan, New Orleans, for defendant-appellant.
LEMMON, Justice.
This is an appeal from a conviction of first degree murder and a sentence of death. The principal issues on appeal involve (1) the trial court's refusal to suppress evidence seized in and around defendant's home; (2) the prosecutor's intimidation of defense witnesses by notifying the court that the witnesses may be charged as accessories after the fact to the murder and requesting that they be advised of their rights against self-incrimination; (3) the trial judge's curtailing of defense counsel's closing argument, and (4) the prosecutor's improper comments in closing arguments in both the guilt and the penalty phase.[1]
After considering every assignment of error, including those abandoned or not argued on appeal, and after making an independent review of the record, we affirm the conviction and sentence.
Facts
The mid-afternoon armed robbery and murder of a sixty-year old woman in the parking lot of Schwegmann Brothers' Supermarket was witnessed by four persons. The witnesses saw a black man accost the woman as she placed her groceries in the trunk of a red Ford LTD. The victim threw her purse into the trunk, slammed the lid, and tried to get away. The assailant chased her and wrestled her to the ground. When she attempted to escape again, the robber grabbed her arm, drew a *268 revolver from his waistband, and fired it into her left temple, killing her instantly. The gunman then took her keys from her hand, got into her car, and drove slowly from the parking lot.
Two days later, Joseph "Beanie" Wallace informed police investigators he had purchased a red Ford LTD the previous day from defendant. The police determined that the car was registered in the victim's name.
Defendant was arrested outside his home a few days later. Police recovered a .32 revolver, which was later determined to be the murder weapon, behind the stove in his kitchen. In a kitchen cabinet, the police found groceries in Schwegmann's bags, including brands of dog and cat food normally purchased by the victim. A search of several garbage bags located at curbside in front of defendant's home turned up the victim's purse, driver's licence and other personal items.
Partial fingerprints were found on the victim's effects, but none was sufficient for a positive identification. No fingerprints were found on the .32 revolver or in the LTD, although defendant's prints were recovered from a Schwegmann's cash register receipt found on the floor of the car. However, the chemical process used to raise the fingerprints on the register receipt destroyed the inked printing on the paper, thus making it impossible to determine what the receipt was for or when the purchase was made.
Three of the eyewitnesses to the murder picked out defendant in photographic line-ups. The witnesses also positively identified defendant at trial as the murderer.
The defense was that the eyewitnesses to the crime were mistaken in their identification of defendant. The defense presented several witnesses who saw Joseph "Beanie" Wallace in a red car similar to the victim's about an hour after the killing. Other witnesses testified that Wallace had attempted to sell the car shortly after the murder. One witness observed Wallace stooping down near the stove in defendant's home the day before the gun was found behind the stove by the police. There was further testimony that Wallace and defendant resembled each other. Additionally, the defense presented testimony that Wallace was very romantically interested in Martina "Pinky" Burns, defendant's long-time girlfriend and the mother of defendant's four children. Finally, defendant took the stand and testified without contradiction that he had no prior convictions. Denying any involvement in the shooting, he explained his fingerprints on the cash register receipt by asserting that Wallace had picked him up in a red car the day after the murder and had taken him to Schwegmann's, where he purchased transmission fluid for his car and a pack of cigarettes. He suggested that the receipt may have fallen from the bag when he removed the package of cigarettes. Elsewhere, there was testimony that defendant's family kept a dog and cat and often fed stray animals in the neighborhood.
On rebuttal, the prosecutor had Wallace brought into the courtroom. Each of the eyewitnesses, after viewing Wallace standing next to defendant, reaffirmed previous identifications of defendant as the murderer.
The jury unanimously found defendant guilty of first degree murder.[2]
In the sentencing phase, the prosecutor reintroduced the evidence adduced in the guilt phase and rested without calling any further witness. The defense called two of defendant's sisters and two of his brothers, who testified that defendant had a close relationship with his children and loved and supported them. Defendant also took the stand and continued to assert his innocence.
The jury unanimously recommended the death penalty, finding as the sole statutory aggravating circumstance that the killing occurred during the commission of an armed *269 robbery. La.C.Cr.P. art. 905.4(a). Hence this appeal.
Sufficiency of the Evidence (Assignment No. 50)
Defendant was positively identified as the murderer by eyewitnesses to the crime, and the murder weapon and personal items belonging to the victim were found in and around defendant's home shortly after the crime. Wallace's testimony (apparently credited by the jury) established that defendant sold the victim's car the day after the murder, and a receipt with defendant's fingerprints was found in the car. Although defendant points out that the eyewitness identification was based on fleeting glimpses from poor angles and that the other evidence was explained away by his witnesses, the evidence, viewed in the light most favorable to the prosecution, was clearly sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of first degree murder.[3]Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
Denial of Motion to Suppress Evidence (Assignments Nos. 2 and 8)
Defendant moved to suppress the victim's purse, driver's license and other personal effects seized without a warrant from plastic garbage bags in front of defendant's home four days after the murder. He also moved to suppress the murder weapon seized inside his home eleven hours after the first seizure.
In the first seizure between 1:00 and 3:00 a.m., the police took possession of five green garbage bags that had been placed in front of defendant's home in the area between the sidewalk and the street curb. An officer testified that there were several holes in the bags from which trash and debris had fallen and that the bags contained leftover food and household garbage. The trial court denied the motion to suppress, ruling that the plastic bags were ordinary garbage which had been abandoned when put out for collection.
Defendant argues that since there was no evidence garbage was to be collected on the day of the seizure, there was no showing of abandonment, and he therefore retained a reasonable expectation of privacy with respect to the bags.
The bags were prepared for collection in the normal manner of handling garbage and were placed in the usual location for regular collection. Thus, the issue is whether the placing of these garbage bags for collection constituted abandonment.[4]
When property has been abandoned, a person's property interest in it lapses, and there is no further reasonable expectation of privacy. As a consequence, the property may be searched and seized without the normally required warrant. See Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), upholding a warrantless search of a wastepaper basket in a hotel room, after the lodger had paid the bill and vacated the premises, because the seized items had been abandoned; State v. Mattheson, 407 So.2d 1150 (La.1982), upholding the seizure of items from the garbage can in the restroom of a restaurant as abandoned property.
Federal courts have uniformly held that placing trash in containers outside the home for collection constitutes abandonment. See United States v. Dela Espriella, 781 F.2d 1432 (9th Cir.1986), upholding a warrantless search of trash containers at curbside; United States v. Sumpter, 669 F.2d 1215 (8th Cir.1982), upholding retrieval by agents from a garbage truck of defendant's trash and indicating that any legitimate expectation of privacy is lost once trash is put out for collection in the usual *270 manner; United States v. Reicherter, 647 F.2d 397 (3rd Cir.1981), upholding the seizure of evidence from defendant's trash when police posed as regular trash collectors; and United States v. Shelby, 573 F.2d 971 (7th Cir.1978), in which the court stated that the placing of trash in garbage cans at a time and place for anticipated collection signifies abandonment.
We likewise conclude in this case that the depositing of items in a garbage bag which is placed in the usual location for collection constitutes abandonment of the items and termination of any expectation of privacy by the owner of the property.
The second seizure, involving the murder weapon (along with another weapon and ammunition), occurred during a search of defendant's home pursuant to a warrant. Defendant contends that the items should have been suppressed because there was an inadequate description in the warrant of the place to be searched and there was no showing in the affidavit that either the informant or his information was reliable.
The purpose of the particularity requirement in warrants is to prevent a search of the wrong premises and thus to insure a person's freedom from unwarranted police intrusion. When the place to be searched is described in sufficient detail so that it is reasonably probable that the wrong place will not be searched, the description is sufficient. State v. Scramuzza, 408 So.2d 1316 (La.1982).
The application for the search warrant in this case described the place to be searched as a "two (2) story Brown wood-frame house, with white trim and surrounding curtilage". Although the application listed "2313" with no street name as the municipal number, the body of the affidavit gave the full address of "2313 Desire St.", and the warrant itself authorized a search of the premises at "2313 Desire St., New Orleans". Neither the affidavit nor the warrant, however, indicated that there was more than one apartment at that address. Nevertheless, Wallace had pointed out where defendant lived, and a surveillance of that building was subsequently conducted. The police delayed acting until defendant exited from one of the apartments, thus signaling in unmistakeable fashion which apartment was his. Only at this point was defendant arrested and his apartment searched. Under these circumstances, there was little probability that the wrong place would be searched, and there was no violation of the particularity requirement.
As to the reliability of the informant and the information, Joseph "Beanie" Wallace furnished the information which led to the search. Wallace contacted homicide detectives two days after the murder and stated that on the previous day defendant had offered to sell him a red Ford LTD for $400. According to Wallace, who had known defendant for a number of years, he agreed to the purchase, even though defendant claimed he had misplaced the registration papers. At the time of the sale of the car, defendant was carrying a .32 pistol. After the sale, Wallace helped defendant unload several bags of groceries, still in Schwegmann's bags, from the trunk of the LTD, where he also noticed a woman's purse. Later that same day, defendant called Wallace and asked for a ride to Schwegmann's to pick up his own car which reportedly had broken down in the parking lot. When they arrived at the parking lot, defendant started the car right up and drove away. Wallace also directed the police to the LTD and pointed out defendant's home.
Before seeking the warrant, the police determined that the car belonged to the victim. They also determined that defendant, along with his girlfriend and their children, lived at the address pointed out by Wallace.
At 8:00 a.m. on the morning after the warrant was issued, the police began a surveillance at the address. When defendant left his home at 10:40, the police moved in and arrested him. The police then searched the home and located the murder weapon behind the stove in defendant's kitchen.
Defendant contends first that there was nothing in the affidavit to show that Wallace *271 or his information was reliable. He points out that Wallace had never supplied information to police before this event and also that Wallace had a previous conviction as an accessory after the fact to murder.
A search or seizure may only be made pursuant to a warrant issued upon probable cause supported by an affidavit of a credible person. U.S. Const. amend. IV; La. Const. art. I, § 5; La.C.Cr.P. art. 162. The function of the judicial officer in determining the existence of probable cause is to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).
The affidavit in this case recites that defendant sold a 1977 Ford LTD to the informant the day after the murder; that defendant unloaded groceries in Schwegmann's bags and a woman's purse from the trunk of the car; that defendant at the time of the sale possessed a weapon of the same caliber as the murder weapon; that the informant soon learned that the car was the one which had been stolen during the robbery and murder; that the informant picked out a photograph of defendant; that the physical description of defendant matched that given by eyewitnesses to the murder; and that the person named by the informant resided at 2313 Desire. While the judicial officer was not furnished the informant's name nor told of his prior record (a fact arguably not proved in the record), the affidavit did recite that the informant had given a signed statement. Further, even if the informant had a criminal record, that fact alone would not rebut the presumption of inherent credibility attaching to citizen informants. State v. Morris, 444 So.2d 1200 (La.1984); State v. Lehnen, 403 So.2d 683 (La.1981).
Consequently, a fair reading of the affidavit indicates the judicial officer was presented with ample specific facts upon which to base an independent decision that there was probable cause to issue the warrant. La.C.Cr.P. art. 162; State v. Brannon, 414 So.2d 335 (La.1982). The totality of the circumstances set forth in the affidavit supported a practical, commonsense conclusion that there was a "fair probability" that evidence of the crime would be found in defendant's home and that the judicial officer had a substantial basis for deciding that probable cause existed. Illinois v. Gates, supra. There was no error in the issuance of the warrant.
Intimidation of Defense Witnesses (Assignment No. 10)
Defendant complains the prosecutor intimidated defense witnesses by notifying the court that the witnesses may be charged as accessories after the fact to the murder and by requesting the court to advise them of their right not to incriminate themselves.
Shortly before the defense began to present its case-in-chief, the trial judge informed defense counsel, outside the presence of the jury, that the prosecutor had notified him that certain defense witnesses might be charged as accessories after the fact to first degree murder and had requested him to advise Johnny Burns and Kevin Black of their right to refuse to testify. The judge indicated that he would allow the defense to use the testimony of the witnesses from defendant's previous trial if either declined to testify. During the ensuing discussion, the prosecutor clarified that he was only considering the possibility and that he did not have any present intention of filing charges against either man.
Overruling defense objections that this was a scare tactic, the judge brought the witnesses into court, appointed an attorney to consult with them, and then advised them as to their privilege against self-incrimination. He cautioned the witnesses that they had the right to refuse to answer any questions if they felt the answer might in any possible way incriminate them. The judge also emphasized that the mere fact of testifying would not automatically result in charges being filed against them. Each *272 witness acknowledged his understanding of the advisement and stated his willingness to testify.[5]
Defendant argues that the prosecutor's request to have the witnesses advised of their rights was a ploy designed to discourage the witnesses from testifying after their earlier testimony had caused a deadlocked jury. Defendant claims the tactic resulted in the witnesses' being visibly nervous and less effective, thereby denying him a fair trial.
Significantly, defendant does not claim either witness altered his testimony in any way as a result of the advice. Moreover, the record provides arguable support that the state had a reasonable basis for considering charging Burns and Black with criminal violations.[6]
In any event, defendant cannot point to any evident prejudice, since both witnesses (even if frightened) testified very favorably to him and steadfastly disputed inuendoes that they participated in the crime, albeit on an after-the-fact basis. The request for advisement to defense witnesses of their constitutional rights to decline to give answers which may incriminate them does not appear to constitute intimidation which so adversely affected any of defendant's substantial rights as to require reversal of the conviction.
Curtailment of Closing Argument (Assignment No. 23)
During closing argument in the guilt phase of the trial, defense counsel asked the panel to consider why the prosecutor had not called Joseph "Beanie" Wallace to the stand. He continued:
"Where is Mr. Beanie to come take the stand and tell you that he didn't change the [license] plate [on the victim's car]? Think about it, please. Could they not have put him on the stand, in accordance with their duty to put on all evidence to support their case. Did they do that? They didn't. Why not? Why not? Has Mr. Beanie been involved in a murder? Does he have a conviction for murder or involved in a murder before?"
The prosecutor objected that this argument went beyond the scope of evidence presented at trial. The trial court sustained the objection and gave the requested admonition to disregard the argument.
Defense counsel contends that the central issue before the jury was the prosecutor's failure to rebut the defense's "damaging evidence" which tended to show Wallace had committed the murder. Noting that the defense was prevented from cross-examining Wallace by the prosecutor's failure to call Wallace as a state witness, counsel argues that Wallace's absence from the witness stand was a legitimate topic for closing argument and that the trial court's curtailment of his exploitation of that weakness in the case was a denial of due process which deprived him of a fair trial.
Counsel's speculation in argument that the prosecutor's reason for not calling Wallace as a witness was that Wallace had a prior conviction for murder clearly went beyond the record. The only evidence on this point was a police mug shot of Wallace and the statement by defendant, when questioned about Wallace's motivation to "frame" him, that Wallace "had been down *273 for murder once and he don't need to be down no more". Thus, the trial judge correctly sustained the prosecutor's objection to the comment about Wallace's prior conviction for murder.
Moreover, Wallace had been subpoenaed by the defense, who could have called and cross-examined him about his version of the events that was contradicted by the defense witnesses. Wallace was clearly a witness hostile to defendant, and defense counsel was entitled to employ leading questions and to impeach the witness through any prior inconsistent statements. La.R.S. 15:277; R.S. 15:487.
Improper Argument by Prosecutor (Assignment No. 24)
In rebutting defense counsel's argument during the guilt phase of the trial, the prosecutor picked up the subject of Joseph "Beanie" Wallace and told the jurors that Wallace had been outside and available for the defense to call as a witness. Defense counsel objected, disputing Wallace's availability. He also objected to the inference that the defense was under a duty to produce any evidence or to call any witnesses. The trial court overruled both objections.
Continuing with his remarks, the prosecutor said:
"I agree [with defense counsel]. The defendant has no burden to call anyone, but I want you to remember who's saying `I couldn't talk to Beanie. I couldn't examine him.' Who's saying that? [Defense counsel] is. You saw Beanie here. If he wants to call him, all he has to do is stand up and say, `I call Joseph Wallace to the stand. I've got some questions I want to ask him.'"
The judge then overruled another objection that the defense had no burden to call anyone, noting that he would instruct the jury on the subject at the proper time.
Defendant argues that the prosecutor's argument was misleading (1) because it did not explain to jurors that the defense could not call or impeach Wallace and (2) because it implied the defense had a duty to adduce testimony from the witness.
As noted earlier, defendant could have called Wallace to the stand and could have asked leading questions or impeached him upon a showing of the witness' hostility (which was very apparent). La.R.S. 15:487. Defendant's argument that he would have been required to show both hostility and surprise is clearly wrong.
As to the second contention, the defense bears no duty to call any witnesses or to produce any evidence. However, the prosecutor did not assert or imply that the defense had a burden to call Wallace. In fact, the prosecutor agreed that the defense had no such burden, and he merely pointed out that Wallace was available to be called by either party. This statement was a proper rebuttal to defendant's argument that the prosecutor's failure to call Wallace deprived him of an opportunity for cross-examination. Moreover, the judge properly instructed the jury that the defense had no burden to call any witnesses or to present any evidence.
Capital Sentence Review
Pursuant to La.C.Cr.P. art. 905.9, this court reviews every sentence of death in the state to determine if it was constitutionally excessive. In making this determination, the court considers whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor; whether the evidence supports at least one statutory aggravating circumstance; and whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the offender and the offense.
According to the uniform capital sentencing report, defendant is a single black male who was twenty-five years old at commission of the crime. He was born in Mississippi. After the death of his father in 1965, he, his seven siblings and his mother moved to New Orleans. He attended public school until dropping out in the ninth grade.
Defendant's employment record is inconsistent and consists of a series of low-paying jobs in manual labor. He has been unemployed since a disabling injury in *274 1982. At the time of the offense, defendant's income consisted of Social Security and disability benefits. He and Martina Burns have five children, the fifth being born after defendant's trial, and defendant contributed to the support of the family until his arrest.
Defendant has no record as a juvenile. As an adult, he has been convicted twice for misdemeanor offenses, theft in 1983 and possession of stolen property in 1983. He has been arrested for attempted aggravated rape (charges refused in 1975) and for an unrelated murder (charges refused in 1984). At the time of trial in December, 1984, he had three pending counts of armed robbery. He stood trial in the present case as a first felony offender, and the jurors were not informed of the details relating to his prior arrests or misdemeanor convictions. His age and lack of significant prior history of criminal activity were urged as mitigating factors. La.C.Cr.P. art. 905.5.
The results of a psychological evaluation indicate defendant has low average range of intellectual functioning, with a composite IQ score of 83.
Although the sixty-year old female victim was white, race was not a factor in the trial. Defendant did not know the victim.
Arbitrary Factors
As to the influence of arbitrary factors, the prosecutor's closing argument in the penalty phase raises serious problems.
The prosecutor began his closing argument with a reminder to the jurors that they had told him in voir dire that they were willing to consider capital punishment and that he was going to hold them to that statement. He then admitted anger in the tone of his voice, stating:
"I'm angry that we, you 12 people and the rest of us here, have to live in a society which tolerates people like that. You've heard five or six people come and take the stand. They've been very upset because they have a loved one who faces the possibility of electrocution. We couldn't put the family of Mrs. Dye on the stand."
The trial judge overruled defense counsel's objection "at this particular point".[7] The prosecutor then concluded that "we couldn't put that family on to tell you what they thought about her because that's not the issue in this case."
After arguing that defendant was clearly guilty in spite of his protestations of innocence, the prosecutor returned to the subject of the victim's family, stating:
"I want you all to very carefully consider the family out there in your deliberation, because probably the most important person in their life was brutally shot down and murdered over some groceries and her purse.... Can any of us be safe now something like this is [d]one without you people saying, you peoplecross section of the community, no, we're not going to stand for this. No we're not going to give you the benefit of life imprisonment. Because, ladies and gentlemen, if you go up there and you vote for life imprisonment he wins. He wins. He'll be happy as he can be because he has won. Life imprisonment means he's won because he knew all along that he was guilty. The evidence showed that he was guilty. He figured if he could get out of this by getting life imprisonment that he won. Let's talk very briefly about what life imprisonment is. Life imprisonment, ladies and gentlemen, isn't a matter of somebody being sent to Devil's Island and having to eat bread and water for the rest of their lives. Life imprisonment means that he's going to go to a penitentiary in this state and he going to be put there to"
Defense counsel's objection to remarks on what goes on in the penitentiary was overruled "at this point". The prosecutor continued:
"That means that he goes to a penitentiary and he starts another life, life, life, life. He continues to live. He makes new friends. He'll continue to have visits from all of those people. They'll be able to go see him on Thanksgiving, Christmas, his birthday, on weekends. *275 They'll be able to go talk to him. Do you know when the Dye family, when they go Memorial Day, when they go on Mrs. Dye's birthday or Christmas or Thanksgiving, do they talk to Mrs. Dye? They go to a grave site and there's a stone there. They don't get to talk to her. Her life was ended. It was ended in the most violent fashion imaginable. That's why I'm angry, because there wasn't one damn reason in the world why he had to do that. If he wanted to take her purse, if he wanted to take her groceries or her car, he didn't have to kill her. That's why we're here right now and that's why my voice is raised because that man should be sentenced to death for what he did. Life imprisonment, visits. He'll be out there playing softball, games, continuing to live, to laugh, because after the initial period of getting used to that he'll start another way of life. He'll have dreams, he'll read books, he'll watch cable television. Mrs. Dye won't. Mrs. Dye's family won't."
At this point the trial judge sustained defense counsel's objection to the comment about cable television. The prosecutor then addressed the seriousness of the crime. When he added that "I don't need to sit here and tell you the state of affairs in this parish and I'm not going to", defense counsel objected and moved for a mistrial. The judge sustained the objection and admonished the prosecutor not to refer to that topic again, but refused to grant a mistrial.[8]
The prosecutor then pointed out the penalty range for armed robbery of up to ninety-nine years and argued that an armed robber would be motivated to kill the only witness if he was likely to get an equivalent sentence of life in any event. Then he requested the jurors "to return a capital verdict against this man and let that be a message". At this point, the trial judge sustained an objection and admonished the jury to disregard the comment, but again denied a mistrial.
The prosecutor then completed his closing argument by warning the jurors not to allow the defense attorney "to put a guilt trip on you" and by reviewing the highlights of the senseless killing. He then asked for the death penalty for this crime against the victim, the community and society in general.
After defense counsel's closing argument, the prosecutor's rebuttal closing was reasoned and contained no appeal to prejudice.
Argument of counsel shall not appeal to prejudice. La.C.Cr.P. art. 774. The prosecutor may not turn closing argument into a plebiscite on crime. State v. Sugar, 408 So.2d 1329 (La.1982). Here, the prosecutor's closing argument was improper at several points, but defense counsel immediately objected and the trial judge sustained the objectiuons. The principal issue is whether the improper remarks in closing argument require the setting aside of the sentence. The court must determine whether the jurors were influenced by the remarks and whether the remarks contributed to the verdict. State v. Knighton, 436 So.2d 1141 (La.1983).
This court has set aside death penalties when we were unable to conclude that an improper closing argument by the prosecutor did not influence the jury's recommendation. State v. Willie, 410 So.2d 1019 (La.1982); State v. Robinson, 421 So.2d 229 (La.1982). Here, the prosecutor made some improper comments which attempted to appeal to the prejudice of the jurors. However, the remarks in this case fall far short of the tirade by the prosecutor in the Robinson case. Indeed, defense counsel in this case was vigilant and objected immediately to the prosecutor's attempts to appeal to prejudice when he began to stray into prohibited subjects such as cable television at Angola, the state of affairs in this parish, and the jury's sending out a message by a death verdict.
A review of the closing argument in its entirety leads us to conclude that the prosecutor's improper remarks did not render the jury's sentence recommendation unreliable. State v. Sharp, 418 So.2d 1344 (La. *276 1982). Credit should be accorded to the good sense and fairmindedness of jurors who have heard the evidence and have been instructed repeatedly by the trial judge that arguments of counsel are not evidence. State v. Dupre, 408 So.2d 1229 (La.1982).
Statutory Aggravating Circumstances
The single aggravating circumstance found by the jury was clearly supported by the evidence, as we noted in discussing the sufficiency of the evidence in the guilt phase. Moreover, this court has consistently rejected the argument that an aggravating circumstance which is an essential element of the crime under Louisiana's definition of first degree murder cannot constitutionally be used as an aggravating circumstance to support the jury's recommendation of death in the penalty phase. State v. Knighton, 436 So.2d 1141 (La.1983); State v. Sawyer, 422 So.2d 95 (La.1982).
Proportionality
A comparative proportionality review is not constitutionally required, as long as the state's overall capital sentencing system provides adequate protection against the arbitrary infliction of the death penalty. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). However, this court, pursuant to Supreme Court Rule XXVIII § 1(c), conducts a proportionality review as a further safeguard against arbitrariness.[9]
Of the sixteen death penalties recommended by juries in Orleans Parish since 1976, two cases are very similar to the present one. The sentences in State v. James, 431 So.2d 399 (La.1983), and State v. Mattheson, 407 So.2d 1150 (La.1981), were based on murders committed during armed robberies.
A killing to overcome the victim's resistance to armed robbery is the type of crime which creates abject terror among lawabiding citizens. Such an unprovoked crime against an elderly person who is pursuing her daily homemaking chores is totally abhorrent to a civilized society.
Furthermore, defendant can point to no mitigating circumstances, other than his lack of a prior significant criminal history, which would suggest that the jury acted unreasonably. While the murderers in James and Mattheson did have significant prior criminal histories, this court has affirmed death penalties in other cases of killings during armed robberies when the murderer lacked a substantial criminal record and there were no other mitigating factors. See State v. Summit, 454 So.2d 1100 (La.1984); State v. Byrne, 483 So.2d 564 (La.1986).
Here, defendant was not a minor participant, but rather was the triggerman and sole actor in carrying out a plan by which he armed himself and lay in wait in a supermarket parking lot for a randomly selected elderly female.[10] There was no moral justification or extenuating circumstance, and there was no influence of mental or emotional disturbance. Defendant was not a teenager nor a person of impaired capacity.
*277 Because of the viciousness of the crime and the lack of any strong factors in mitigation, we are convinced that the jury's verdict was not the "action of an aberrant jury." Gregg v. Georgia, supra.
Decree
The conviction of first degree murder and sentence of death are affirmed.
MARCUS, J., concurs and assigns reasons.
DENNIS, J., concurs with reasons.
MARCUS, Justice (concurring).
I do not agree with the majority's view that defendant was entitled to call Wallace to the stand and employ leading questions and to impeach him simply because he was potentially an adverse witness. When a defendant calls a witness not yet called by the state, the witness becomes the defendant's. No one can impeach his own witness unless (1) the witness' testimony took him by surprise or (2) the witness proved to be hostile. La.R.S. 15:277, 15:487. State v. Nuccio, 454 So.2d 93 (La.1984); State v. Rogers, 324 So.2d 403 (La.1975); State v. Bush, 297 So.2d 415 (La.1974); and State v. Brent, 248 La. 1072, 184 So.2d 14, cert. denied, 385 U.S. 992, 87 S.Ct. 605, 17 L.Ed.2d 452 (1966). However, I do not consider the prosecutor's comments during closing argument in the guilt phase to be reversible error. Accordingly, I respectfully concur.
DENNIS, Justice, concurring.
I respectfully concur in the decree affirming the conviction and sentence, but disagree with the majority opinion in the following particulars:

Denial of Motion to Suppress Evidence

(Assignment Nos. 2 and 8)
It is correct to say the particularity requirement in the fourth amendment for warrants is to prevent a search of the wrong premises and to insure a person's freedom from unwarranted police intrusion, but these are not the only purposes of the particularity requirement. Rather, the requirement of particularity also reflects several other underlying goals of the amendmentthe prevention of general searches, the ensurance that the executing officer knows what items are to be seized and those that are not and to prevent the issuance of warrants on vague or doubtful bases of fact. Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927); and Go-Bart Importing Co. v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374 (1931). See 2 W. LaFave, Search and Seizure, A Treatise of the Fourth Amendment, § 4.6(a), at 234-36 (1987).
Additionally, the majority's statement that a criminal record alone is not enough to rebut the credibility presumption of a citizen informer is too broad a pronouncement. In State v. Morris, 444 So.2d 1200, 1203 (La.1984), this court more precisely stated that a "[c]onviction of a prior crime should not suggest unreliability if the prior offense is unrelated to the crime witnessed or there is no apparent motive for reporting criminal activity, such as the hope of reducing a penalty."

Intimidation of Defense Witnesses

(Assignment No. 10)
It was unconscionable for the trial court to call the defendants' witnesses aside, warn them of the possibility of their prosecution for perjury, and advise them of the right against self incrimination just prior to their taking the witness stand. Such a practice should be more strongly reprobated than done by the majority because of the possibility that it may be used to discourage defense witnesses from testifying. Nevertheless, the error was harmless in this case since both witnesses testified favorably for the defendant despite the trial judge's clearly improper actions.

Curtailment of Closing Argument

(Assignment No. 23)
The trial court incorrectly curtailed defense counsel's closing argument when it forbade him to ask the jury during closing argument to consider why the prosecutor had failed to call Joseph "Beanie" Wallace.
*278 There was sufficient evidence to justify the argument. A police mug shot of Wallace had been entered into evidence and the defendant had testified, when asked about Wallace's motive for wanting to frame him, that Wallace "had been down for murder once and he don't need to be down no more." However, the defense attorney effectively made his point before the objection was sustained, and the error was therefore harmless.

Proportionality
The majority states, "A comparative proportionality review is not constitutionally required, as long as the state's overall capital sentencing system provides adequate protection against the arbitrary infliction of the death penalty," citing Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). This statement is, however, incomplete because it disregards the requirement by state constitution and our rule of a proportionality review of every capital sentence. In State v. Brogdon, 457 So.2d 616, 631 (La.1984), citing La. Const. Art. I, § 20 and La. Supreme Court Rule XXVIII, we held that "This court is required by our state constitution and its own rule in each capital sentence review to conduct a comparative proportionality review to determine whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

ON APPLICATION FOR REHEARING
PER CURIAM.
On original hearing, the court failed to include in its decree the language generally used in the affirmation of a death sentence which stays the execution of the sentence until denial of a timely application for certiorari and of a timely application for rehearing from the denial by the Supreme Court of the United States. Accordingly, the decree on original hearing is amended to read as follows:
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes except that this judgment shall not serve as a condition precedent to execution as provided by La.R.S. 15:567 until
(a) defendant fails to petition the United States Supreme Court timely for certiorari,
(b) that court denies his petition for certiorari,
(c) having filed for and been denied certiorari defendant fails to petition the United States Supreme Court timely under their prevailing Rules for applying for rehearing of denial of certiorari, or
(d) that court denies his application for rehearing.
In all other respects, the application for rehearing is denied.
NOTES
[1] Defendant's other assignments of error involve only settled principles of law and are treated in an unpublished appendix, which is attached to this opinion and is part of the official record.
[2] An earlier trial ended in a mistrial when the jury was hopelessly deadlocked after almost four hours of deliberation.
[3] Although counsel lists sufficiency of the evidence as an assignment of error, he did not truly contest the sufficiency under the Jackson standard. Rather, defense counsel pointed out that the evidence was not overwhelming in order to avoid a harmless error determination if other assignments of error otherwise warranted reversal of the conviction.
[4] The police had obtained a warrant to search the "premises" at 2313 Desire Street at least six hours prior to the seizure of the plastic bags. We need not decide, however, whether the warrant covered this property.
[5] Black's testimony placed Wallace in a red car between 3:15 and 3:30 p.m. on the afternoon of the murder. Burns, the brother of Martina Burns (defendant's girlfriend and the mother of his children), stated he had also seen Wallace in a red car, and he further testified that he had seen Wallace stooping down near defendant's stove on the Sunday after the murder. Burns added that Wallace routinely carried a gun and that he had seen Wallace in possession of.25, .32 and .357 caliber weapons.
[6] The prosecutor questioned each witness in great detail about their being with defendant and Wallace within an hour of the shooting, helping unload the victim's car, and providing transportation to defendant for the return trip to Schwegmann's to pick up his own car. If Wallace provided information to the prosecutor indicating Burns and Black facilitated defendant's attempts to avoid apprehension and destroy evidence, the prosecutor had a legitimate basis for considering prosecution under the accessory statute, La.R.S. 14:25, or the obstruction of justice statute, La.R.S. 14:130.1. Under these circumstances, the prosecutor arguably acted properly in notifying the court and in requesting that the witnesses be advised of their constitutional right not to incriminate themselves.
[7] The overruling of defense counsel's objection was the basis of Assignment of Error No. 44.
[8] This refusal to grant a mistrial was the basis of Assignments of Error Nos. 45, 46 and 47.
[9] Proportionality review was never intended as a method of achieving "slide-rule" uniformity in the application of the death sentence. The role of proportionality review under the 1976 statute, as originally enacted, was to identify those death eligible cases in which juries recommended the death sentence so infrequently that the recommendation of death in the particular case might be deemed the "action of an aberrant jury". Gregg v. Georgia, 428 U.S. 153, 206, 96 S.Ct. 2909, 2940, 49 L.Ed.2d 859 (1976). The Supreme Court clearly stated the purpose:

"The provision for appellate review in the Georgia capital-sentencing system serves as a check against the random or arbitrary imposition of the death penalty. In particular, the proportionality review substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury. If a time comes when juries generally do not impose the death sentence in a certain kind of murder case, the appellate review procedures assure that no defendant convicted under such circumstances will suffer a sentence of death." (emphasis supplied)
[10] The only case in which this court set aside a death penalty as disproportionate was State v. Sonnier, 380 So.2d 1 (La.1979). The younger of two brothers who raped and murdered a young girl was spared, not because of the lack of significant aggravating circumstances, but because he was under the domination of his older brother (who has since been executed) and played a relatively minor role in the horribly vicious crime.