STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT


09-440


STATE OF LOUISIANA

VERSUS

WILLIE J. BEAUDION

**********
APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. C-12786
HONORABLE DEE A. HAWTHORNE, PRESIDING
**********

SYLVIA R. COOKS
JUDGE

**********

Court composed of Sylvia R. Cooks, John D. Saunders, and Shannon J. Gremillion, Judges.

AFFIRMED.


Billy J. Harrington, ADA
Parish of Natchitoches
P.O. Box 838
Natchitoches, LA 71458-0838
(318) 357-2214
COUNSEL FOR APPELLEE:
      State of Louisiana

Edward K. Bauman
Louisiana Appellate Project
P.O. Box 1641
Lake Charles, LA 70602-1641
(337) 491-0570
COUNSEL FOR DEFENDANT-APPELLANT:
      Willie J. Beaudion

**COOKS, Judge.**

On April 1, 2008, Defendant, Willie J. Beaudion, was found guilty by jury verdict of possessing a schedule II controlled dangerous substance, in violation of La.R.S. 40:967. After considering the information in the presentence investigation report (PSI), the court ordered Defendant to serve five years at hard labor with credit for time served. Defendant did not file a motion to reconsider sentence with the district court. Defendant now appeals. We affirm Defendant's conviction and sentence and relegate the unresolved ineffective assistance of counsel issues to post-conviction relief.

## STATEMENT OF FACTS

In the early morning hours of April 5, 2007, Officer Jody Campbell, who was employed by the Natchitoches City Police, saw Defendant standing in the middle of the roadway, signaling for Officer Campbell to stop. Defendant informed Officer Campbell that someone had taken his money. At that time, Corporal Keith McDonald of the Natchitoches Police Department arrived on the scene, and spoke with Defendant while Officer Campbell spoke with the people standing in the driveway of the nearby house where Defendant alleged the theft had occurred. As he conversed with the people at the house, Officer Campbell heard Corporal McDonald begin to scuffle with Defendant.

Officer Campbell stated when he went to assist Corporal McDonald, he saw that Corporal McDonald had already handcuffed Defendant. Officer Campbell stated that he and Corporal McDonald then found eight rocks of crack cocaine scattered on the ground between their law enforcement vehicles. Officer Campbell then secured the scene while Corporal McDonald put Defendant in Officer Campbell's unit. Subsequent testing confirmed the rock like material to be crack cocaine.

Corporal McDonald testified he became aware that Officer Campbell had been stopped to deal with an alleged robbery, and he went to assist as is usual for officers working late-night patrol. When Corporal McDonald arrived on the scene, Officer Campbell asked him to stand with Defendant while Officer Campbell talked to the people Defendant claimed took money from him.

Corporal McDonald reported that, in accordance with Officer Campbell's request, he approached Defendant and asked him for identification. Defendant reached into his pocket to retrieve his identification, and when he began pulling the identification out of the pocket, rock like substances came out of the pocket. Defendant attempted to push the rocks back into his pocket, but Corporal McDonald recognized the substance and asked Defendant what he had in his pocket. Defendant then threw the drugs onto the ground beside the car and attempted to run. After subduing him, Corporal McDonald took Defendant into custody.

On cross-examination, Corporal McDonald stated he was familiar with the area of Natchitoches in which Defendant had flagged down Officer Campbell. Corporal McDonald related that the residence to which Defendant had been gesturing during his allegation of robbery was known to Corporal McDonald as Rook's crack house. Corporal McDonald recalled that, as he was putting Defendant in the car, Defendant told him someone had put the drugs in his pocket. Corporal McDonald submitted a report containing Defendant's statement to the district attorney's office.

The defense called Wilbert Moody as its first witness. Mr. Moody knew Defendant for approximately ten years prior to trial and was aware Defendant had been charged with possession of crack cocaine. Mr. Moody stated he was in the house drinking and smoking with other people when Defendant entered. He stated that Defendant was going to purchase some drugs to share, but Defendant did not

have a chance because "they" tried to rob him. One of the women present and the owner of the house, Charles White, approached Defendant and began tussling with him. The pair were trying to get money out of Defendant's pocket. Mr. Moody maintained that Mr. White, who had crack cocaine in one of his hands, inserted the hand containing the crack cocaine into Defendant's pocket during the altercation. Mr. Moody said he saw Mr. White remove something green from Defendant's pocket; Mr. Moody did not see whether or not Mr. White still had drugs in his hand.

Mr. Moody said Defendant struggled with the two until he made it outside. The pair followed Defendant out the door, and the police came. Mr. Moody and the others went back inside the house. Mr. Moody said Mr. White immediately tried to rob Defendant as soon as Defendant entered the residence. Although Defendant was there to buy crack cocaine, he did not have a chance to do so before he was robbed.

According to Mr. Moody, Mr. White commented they did not have to worry about Defendant anymore because the police took Defendant away for having dope in his pocket. Mr. Moody also said Mr. White told him he had intentionally left drugs in Defendant's pocket.

On cross-examination, Mr. Moody stated Defendant told the people in the house he would buy a piece for them to smoke. Mr. White sold cocaine, and his house was considered a crack house because people bought and smoked crack there. Mr. Moody acknowledged he smoked crack that evening.

On re-direct examination, Mr. Moody asserted he was testifying because he knew the truth about what happened even though he realized that his testimony could harm him later. Mr. Moody, who was near Defendant that evening, did not see Defendant purchase any dope that night.

Michael Dyas was the second witness for the defense. Mr. Dyas testified he

had known Defendant all his life, and was present for the events at Mr. White's house. He testified as follows:

> A.    Willie [Defendant] came in, Rook got up, met him at the door. He had some rocks in his hand cause we was sitting there to the table. Okay immediately with him getting up the rest of them girls got up. And I'm sitting and I'm looking over there, I don't know if they tussling or they playing or what. And everybody know when Willie James come in he got a pocket full of money. I mean that's the reason he come back there. I mean you know. And Rook's going in his pocket, getting the money; the girl's going in his pocket. And they started; Rook was arguing and stole (inaudible). When they do this . . .

> . . . .

> A.    They started an argument, I don't know whether they fighting or tussling. So I get up and go to the back room. Cause I don't want to be around that.

> . . . .

> A.    I want to explain to you. When Rook got up, went to the door, Willie James knocked on the door. He got up, go to the door, let Willie James in. He got some rocks in his hand cause I'm sitting there to [the] table with him getting high. Okay well Willie James come in, oh Willie James, I don't know what all of them saying, I don't know whether they arguing. To the day I don't know whether they arguing or they playing or what. Oh man you got some money so he goes in his pocket. Well he go in his pocket, some girls go in his pocket, his other pocket over here too. You know. And he fighting the girls back and fighting them off, I don't know whether they arguing or fighting or what. I say oh man you know so I get up and go back to the back where everybody else at.

> . . . .

> A.    He [Rook] had dope in his hand when he got up when he went to the door when he got up off the table. When you smoking dope you ain't gonna leave it there for nobody else to get up and get that, with his hand just like this cause he gotta open the key to open the door to let him in. He got another door there, he's gotta let him in, that's what he do to let everybody in.

On cross-examination, Mr. Dyas stated he was in jail for distributing crack cocaine. Mr. Dyas admitted he regularly smoked crack cocaine, on occasion with Defendant at that location, and is familiar with the cocaine or crack scene.

Defendant's mother, Eartis Beaudoin, also testified for the defense. Ms.

-4-

Beaudoin explained that Defendant had money that evening because he had just received payment from a lawsuit.

<u>ANALYSIS</u>

Defendant argues the trial court erred in finding him guilty of the crime charged. He contends, despite his intent to purchase crack cocaine when he entered the house, he should not have been found guilty of possession of cocaine because he was unaware that there was cocaine in his possession when he left the house; instead, he thought he had been robbed. The State countered that there was sufficient evidence to support Defendant's conviction as officers discovered Defendant to be in possession of crack cocaine.

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. It is not the function of an appellate court to assess credibility or re-weigh the evidence.

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86 (citations omitted).

Under La.R.S. 40:967(C), it is illegal to knowingly possess crack cocaine:

> Possession. It is unlawful for any person knowingly or intentionally to possess a controlled dangerous substance as classified in Schedule II unless such substance was obtained directly or pursuant to a valid prescription or order from a practitioner, as provided in R.S. 40:978 while acting in the course of his professional practice, or except as otherwise authorized by this Part.

The evidence shows Defendant went into a known crack house for the purpose of purchasing crack cocaine. When Defendant left, he had crack cocaine in his pants pocket. When the officer asked Defendant what he had in his pocket, Defendant

-5-

attempted to discard the drugs. Although Defendant presented a defense that he did not knowingly and intentionally possess the drugs, the jury disagreed.

In *State v. Vanburen*, 08-824, p. 7 (La.App. 4 Cir. 12/30/08), 3 So.3d 552, 556, the fourth circuit affirmed a conviction for possession of cocaine under the following circumstances: "Officers Baldassaro and Gagnon testified that they witnessed Vanburen reach into his pocket and discard an object. Subsequent testing by the state confirmed that the object discarded was cocaine."

Similarly, in this case it is uncontested that Defendant had crack cocaine in his possession. Instead, Defendant contends he lacked the intent and guilty knowledge necessary to prove he knowingly and intentionally possessed the illicit substance. However, the evidence showed Defendant went to a crack house with the intent to obtain crack cocaine. When Defendant emerged from the crack house, he was in possession of the drug. Further, Defendant's attempt to conceal, then discard, the illicit substance shows Defendant was aware of the nature of the substance.

Accordingly, we find this assignment of error is without merit because there is sufficient evidence to support Defendant's conviction for possession of cocaine.

Defendant also contends "the trial court erred in its instruction to the jury prior to ordering the jury to retire for further deliberations." Defendant argues that after polling of the jury revealed that the vote had been five for and one against, he should have been acquitted. Thus, Defendant claims the trial court erred in sending the jury back into deliberations with the following instruction:

> THE COURT: All right I have uh, again you must have six in favor of the verdict and by polling the jury it's been determined that there are not six yeses. So I'm going to send you back so there must have been an error in calculating, ask you to consider the verdict again and, or consider your decision again and let me know when you have reached a decision. All right. Okay we will, let me prepare a new, give me them a new form. If you'll give that to the foreman.

After the jury retired for the additional deliberations ordered by the district court, defense counsel objected on the basis that the jurors had the option to either deliberate again or accept a hung jury, but the trial court's instructions did not inform the jurors they had a right to return with a hung jury; instead, the district court's instructions implied the dissenting juror must change her vote. The State responded that the jurors stated they thought they had reached a verdict; they had not stated they were unable to reach a verdict.

The trial court ruled that it had appropriately advised the jury:

THE COURT: The Court finds that uh, it, the jury indicated to, in open court that they had reached a verdict. So clearly they believed they had reached a verdict. There was an error when we polled the jury which is why we poll juries and I sent them back to continue deliberating until they reached a verdict. They did not come and tell me they were unable to reach a verdict. And under the statute I believe that the Court uh, is correct in sending the jurors back to continue.

Louisiana Code of Criminal Procedure Article 812(2) establishes the procedure for taking a written poll of a jury's verdict:

The procedure for the written polling of the jury shall require that the clerk hand to each juror a separate piece of paper containing the name of the juror and the words "Is this your verdict?" Each juror shall write on the slip of paper the words "Yes" or "No" along with his signature. The clerk shall collect the slips of paper, make them available for inspection by the court and counsel, and record the results. If a sufficient number of jurors as required by law to reach a verdict answer "yes" the clerk shall so inform the court. Upon verification of the results, the court shall order the clerk to record the verdict and order the jury discharged. If an insufficient number required to find a verdict answer "Yes," the court may remand the jury for further deliberation, or the court may declare a mistrial in accordance with Article 775.

Thus, under La.Code Crim.P. art. 812(2), the trial court, upon finding the vote insufficient for a guilty verdict, could either declare a mistrial or remand the jury for further deliberations.

In *State v. Brooks*, 633 So.2d 659 (La.App. 1 Cir. 1993), *writ denied*, 94-308 (La. 5/20/94), 637 So.2d 475, the trial court's poll of the jury revealed an insufficient

number of votes to return a guilty verdict. The district court explained that ten jurors must agree to return a guilty verdict. *Id*. When the jury foreman stated there had been ten guilty votes in the jury room, the trial court asked if any of the jurors had changed their minds. Thereafter, the district "court ordered the jury to return to the jury room, reminding them again that ten jurors must agree on a verdict." *Id*. at 663. Based on the juror polling, the defense moved for a mistrial or a mistrial by hung jury; the trial court denied the motion. The first circuit held there had been no abuse of discretion in the trial court's ruling because the jury had initially returned with a verdict although polling revealed it was not a legal verdict. Thus, there had been no acquittal or deadlocked jury. *Id*.

Therefore, under the reasoning in *Brooks*, there was no abuse of discretion in the trial court's denial of Defendant's motion for mistrial as the jury indicated it had a verdict although subsequent polling revealed it was an invalid verdict. The grand jury foreperson did not state the jury had been unable to reach a verdict; thus, the trial court did not err in reminding the jurors that six votes for guilty were required to return a guilty verdict, in asking the jurors to reconsider their verdict, and in ordering the jury to further deliberate.

Although Defendant contends the district court's instruction constituted an illegal attempt to overcome a deadlocked jury as described in *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154 (1896), the instant case is distinguishable because the jury in Defendant's case returned with a guilty verdict; it did not return with an assertion that it was unable to reach a verdict. *See State v. Campbell*, 606 So.2d 38, 39-41 (La.App. 4 Cir. 1992); *see also State v. Nicholson*, 315 So.2d 639, 640-44 (La.1975). Accordingly, this assignment of error is without merit.

Defendant also argues his five-year sentence was unconstitutionally excessive. Defendant argues the trial court imposed sentence while under the erroneous impression that Defendant was not eligible for probation, thus, the sentence should be set aside. Defendant maintains he would be eligible for probation if he entered a drug treatment program under La.Code Crim.P. art. 893(B). Defendant further asserts the trial court failed to adequately particularize the sentence because it failed to reference any factors justifying the imposition of the maximum penalty other than stating Defendant had an extensive criminal record.

The State countered that the maximum sentence imposed on Defendant in this case was not excessive because he was a third felony offender with a significant criminal history.

Defendant neither verbally moved for reconsideration of his sentence nor filed a motion to reconsider sentence with the trial court alleging specific errors. When a defendant moves for reconsideration of sentence without specifying the ground for reconsideration, this court is limited to a "bare bones" review of excessiveness. *State v. Barling*, 00-1241, 01-1591 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331. In *Barling*, 779 So.2d at 1042, we discussed the standard for reviewing excessive sentence claims:

> [Louisiana Constitution Article] I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. (Citations omitted).

"[T]he trial judge need not articulate every aggravating and mitigating circumstance

-9-

outlined in art. 894.1[;] the record must reflect that he adequately considered these guidelines in particularizing the sentence to the defendant." *State v. Smith*, 433 So.2d 688, 698 (La.1983).

Louisiana Revised Statute 40:967(C)(2) sets forth the penalty provision for simple possession of crack cocaine: "Any person who violates this Subsection as to any other controlled dangerous substance shall be imprisoned with or without hard labor for not more than five years and, in addition, may be sentenced to pay a fine of not more than five thousand dollars." Thus, Defendant's five-year sentence is the maximum term of imprisonment allowed by the statute. "Generally, maximum sentences are reserved for cases involving the most serious violations of the offense charged, and the worst type of offender." *State v. McCorkle*, 97-966, p. 13 (La.App. 5 Cir. 2/25/98), 708 So.2d 1212, 1218.

When the district court sentenced Defendant on June 13, 2008, it issued verbal reasons for the penalty it imposed. (R.p. 129).

> THE COURT: You had a trial and I ordered a pre-sentencing investigation so that I could get information about you.
>
>     . . . .
>
> THE COURT: Because I am required to consider a number of factors before I decide what my sentencing should be. Now you are not eligible for a probated sentence because you have been convicted of a felony, I think this is your third felony offense. So that is not something I could consider. Cause based on the rules and the law that's what it says. Now[,] one of the factors that I did consider was your history, your history of criminal offenses. And it's quite long. I think in one case you had been on probation for aggravated battery, armed robbery and simple escape and you were, that's not the one, that was in 1979. I think you ended up being charged on simple robbery, simple escape and agg[.] battery amended to simple battery. But the really [sic], this other one you were charged with attempted second degree murder which they amended down to a second degree battery. And you were revoked four times during that period of time that you were, whenever you got out you kept getting revoked and get sent back in. And there is a whole other page of charges against you. So[,] you have a long history of being involved in criminal activity. And that's not good. You were

tried before a jury that determined that you were guilty of the charge. They heard all of the evidence that was presented and all of the uh, uh, concerns that were presented by you and your attorney. Now uh, so consequently, I don't have the choice of being, being able to decide whether you go to jail or not go to jail because you can't be on a probated sentence according to the statute. This is strictly a drug; this is strictly a drug offense. There was no use of violence at all involved in this. All right[,] under uh, under the fifteenth item under Article 894.1[,] which are the sentencing guidelines[,] this offense was a controlled dangerous substance offense. I don't think you obtained a significant amount of money[,] but I think that you uh, did go in and buy and that you had been doing it regularly. There were other people involved around you and your long history of criminal conduct. So[,] basically[,] based on the crime, the sentence that's allowed and your long history of criminal offense[s,] the Court feels compelled to sentence you to what's required under the law and that's five years with the DOC at hard labor. I give you credit for all your time that you've served . . . .

In *McCorkle*, the fifth circuit affirmed a maximum term of imprisonment for possession of cocaine. The fifth circuit pointed out that, while the defendant had been sentenced to the maximum term of imprisonment allowed by statute, the defendant had not received the maximum sentence allowed because he had not been fined in addition to the term of imprisonment. The fifth circuit further noted that the defendant had a lengthy criminal history. In the instant case, Defendant was not fined by the trial court and also has a lengthy criminal history.

The record before this court shows Defendant has an extensive criminal record dating back to 1979. The criminal history includes crimes of violence, probation or parole violations, and escape from custody. As stated by the trial court, the testimony at trial by Defendant's own witnesses shows Defendant had been regularly engaging in the illegal possession of crack cocaine. Despite, Defendant's lengthy criminal history, the State did not charge Defendant as a habitual offender. Moreover, the sentencing court refrained from imposing a fine in addition to Defendant's term of imprisonment. Therefore, we find the trial court's imposition of the maximum term of imprisonment in the instant case did not constitute an abuse of discretion.

## *PRO SE* ASSIGNMENTS OF ERROR

Defendant, in his *pro se* brief, contends statements made by the prosecutor and the court to his witnesses violated the compulsory rights of those witnesses. Defendant specifically argues error occurred when Deputy Gregg Dunn warned defense witnesses that, although no criminal charges were being contemplated against them at the time, criminal charges could result from their testimony. Defendant further complains Deputy Dunn then *Mirandized* the defense witnesses. Based on the actions of Deputy Dunn, Defendant asserts the prosecution violated La.R.S. 14:129.1, which prohibits intimidation of witnesses.

Prior to the defense calling its witnesses to testify, court recessed and the bailiff removed the jury from the courtroom. The trial court asked defense counsel if Defendant's witnesses, who were going to testify about what happened in the crack house, had been informed they would be incriminating themselves, had been advised they had the right to remain silent, and had been told that their statements could be used against them. Defendant's attorney stated they were aware their statements would be incriminating, but defense counsel had not informed them of their rights. The district court stated it was necessary and asked for someone present who had the *Miranda* rights memorized to inform the witnesses of their rights on the record.

The trial court had Mr. Dyas removed from the courtroom and had Mr. Moody sworn in. The district court told Mr. Moody it wanted to insure that Mr. Moody understood he had certain rights and Deputy Dunn would inform him of those rights. Deputy Dunn then informed Mr. Moody, "You have the right to remain silent. Anything you say can and will be used against you in court. If you cannot afford to hire an attorney, one will be appointed for you." Deputy Dunn then asked if Mr. Moody understood his rights, and Mr. Moody replied, "Yes."

The district court next stated that Mr. Moody could waive the rights, but it just wanted to make sure Mr. Moody had been advised of his rights. At this point, defense counsel told Mr. Moody that no charges were currently contemplated against him, and Deputy Dunn confirmed he had no warrants for Mr. Moody. Deputy Dunn continued that, depending on what Mr. Moody said, he "may have something on him after."

After dismissing Mr. Moody from the courtroom, the trial court called Mr. Dyas to be sworn in. The district court explained to Mr. Dyas that it wanted to insure he understood his rights before testifying and that Deputy Dunn would inform him of his rights. Deputy Dunn repeated the statement of rights he had previously read to Mr. Moody and asked whether Mr. Dyas understood his rights. Mr. Dyas said he understood. The trial court explained Mr. Dyas could waive his rights and, by testifying at trial, Mr. Dyas would be waiving his rights; Mr. Dyas indicated he understood.

The supreme court addressed a similar issue in *State v. Kyles*, 513 So.2d 265 (La.1987), *cert. denied*, 486 U.S. 1027, 108 S.Ct. 2005 (1988), *and conviction later rev'd on other grounds*, *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555 (1995). In *Kyles* the trial court informed defense counsel, prior to the defendant's case-in-chief, that several of the defense witnesses could be charged as accessories after the fact based on their trial testimony. The prosecutor told the defendant's attorney that it was not presently contemplating charges against either witness. Over defense counsel's objection that this was a scare tactic, the trial court brought the witnesses into court, appointed an attorney to consult with them, and advised them of their privilege against self-incrimination. Both witnesses indicated they understood this right and agreed to testify. On appeal, the defendant complained this advisement of rights

amounted to intimidation of the defense witnesses in order to discourage the witnesses from testifying. After determining that the witnesses both steadfastly testified very favorably for the defendant, the supreme court held the complaint to be without merit: "The request for advisement to defense witnesses of their constitutional rights to decline to give answers which may incriminate them does not appear to constitute intimidation which so adversely affected any of defendant's substantial rights as to require reversal of the conviction." *Id.* at 269.

As in *Kyles*, the witnesses in the present case staunchly supported the theory of defense presented in the instant case. Neither witness declined to answer any of the questions presented to them on grounds of possible self-incrimination. Thus, no substantial rights of Defendant's were affected by the court having the witnesses informed of *their* constitutional rights. Accordingly, this assignment of error is without merit.

Defendant lastly argues he was denied effective assistance of counsel in the following instances: (1) his trial attorney's failure to file the pretrial motions he requested, (2) because the judge had to inform defense counsel to what she was objecting, (3) because counsel failed to move for a mistrial when the jury returned a non-unanimous verdict, (4) by his trial lawyer not objecting when Deputy Dunn *Mirandized* defense witnesses in open court, and (5) by his defense counsel referencing Defendant's prior criminal behavior during the sentencing phase.

Usually, ineffective assistance of counsel claims raised on appeal are relegated to post-conviction relief:

> Claims of ineffective assistance of counsel are more properly raised in an application for post-conviction relief in the trial court because it provides the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. When the record is sufficient, however, allegations of ineffective assistance of trial counsel may be resolved on direct appeal in the interest of judicial economy.

*State v. Lee*, 08-456, pp. 8-9 (La.App. 3 Cir. 11/5/08), 996 So.2d 1217, 1223 (citations omitted) (quoting *State v. Eiskina*, 42,492, pp. 2-3 (La.App. 2 Cir. 9/19/07), 965 So.2d 1010, 1013).

This court has held that ineffective assistance of counsel claims must meet two separate criteria in order to have merit:

> The right of a defendant in a criminal proceeding to the effective assistance of counsel is constitutionally mandated by the Sixth Amendment of the U.S. Constitution. In order to prove that counsel was ineffective, the defendant must meet the two-pronged test enunciated by the Supreme Court. First, the defendant must show that counsel's performance was deficient. Second, the defendant must show that this deficiency prejudiced the outcome of the trial. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish a claim of ineffective assistance of counsel, a defendant must demonstrate that his defense attorney failed to meet the level of competency normally demanded of attorneys in criminal cases.

> In considering allegations of ineffectiveness, defense attorneys are entitled to a strong presumption that their conduct fell within the broad range of reasonable professional assistance. The United States Supreme Court has held that the benchmark for judging a charge of ineffectiveness is whether the attorney's conduct so undermined the proper functioning of the adversarial process that the trial cannot be considered to have produced a just result.

> It is not enough for an accused to make allegations of ineffectiveness; the accused must couple these allegations with a specific showing of prejudice. A claim of ineffective assistance of counsel may be disposed of based upon a failure to satisfy either criteria of the established two-pronged test; if the accused's claim fails to satisfy one, the reviewing court need not address the other. A brief review of the defendant's complaints against his attorneys will demonstrate the deficiency of his arguments.

*State v. James*, 95-962, pp. 4-5 (La.App. 3 Cir. 2/14/96), 670 So.2d 461, 465 (citations omitted). Moreover, "[i]t is not sufficient for the defendant to show the error had some conceivable effect on the outcome of the proceedings. Rather, he must show that but for counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have been different." *State v. Jones*, 33,657, p. 11 (La.App. 2 Cir. 8/23/00), 765 So.2d 1191, 1199, *writ denied,* 00-2779

(La. 6/29/01), 794 So.2d 825.

Defendant's first ineffective assistance of counsel claim is that his trial attorney's failed to file the pretrial motions he requested. Because this claim would require findings of fact not in the record, this claim must be relegated to post-conviction relief.

Defendant next asserts he was denied effective assistance of trial counsel because the trial court had to inform defense counsel to what she was objecting. We have examined the trial and sentencing transcripts for any occurrence where the trial court had to inform defense counsel to what she was objecting. Our review revealed one such instance involving defense counsel. When defense counsel objected and explained her objection, the trial court asked, "So you're suggesting that it's hearsay." When defense counsel agreed her objection was to the hearsay nature of the evidence, the trial court sustained the objection insofar as to allow the prosecution to proceed by rephrasing the question. Because defense counsel's objection was sustained, Defendant was not prejudiced by the trial court clarifying defense counsel's objection. Therefore, this assertion is without merit.

Defendant next contends he was denied effective assistance of trial counsel when his lawyer failed to move for a mistrial based on the jury returning a non-unanimous verdict. The record shows there were two unrecorded bench conferences prior to the trial court sending the jury back to reconsider its verdict. Ordinarily, this contention would be relegated to post-conviction relief. However, after the district court returned the jury for further deliberations, defense counsel objected on the record. Thus, this contention is without merit.

Defendant then argues he was denied effective assistance of trial counsel because his attorney did not object when Deputy Dunn *Mirandized* defense witnesses

in open court. This issue was addressed above and we determined Defendant was not prejudiced by the witnesses being informed of their rights. Because any failure by defense counsel to object to the preservation of the witnesses' rights did not constitute a deficient performance, Defendant's argument is without merit.

Finally, Defendant complains he was denied effective assistance of counsel when his lawyer referenced Defendant's other criminal acts during the sentencing phase. The sentencing transcript shows that defense counsel's reference to pending criminal charges against Defendant occurred after the sentencing court had already imposed the penalty for the current offense. Because the outcome of the proceeding was not prejudiced by defense counsel's reference to those charges, Defendant's complaint is without merit.

Accordingly, we will relegate issues (1) presented in Defendant's *Pro Se* Assignment of Error No. 2 to post-conviction relief.

**DECREE**

For the foregoing reasons, Defendant's conviction and sentence are affirmed.

**AFFIRMED.**