# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 10-982

**STATE OF LOUISIANA**

**VERSUS**

**R.K.**

**********

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO.691169
HONORABLE JAMES R. MITCHELL, DISTRICT JUDGE

**********

## SYLVIA R. COOKS
## JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks and Elizabeth A. Pickett, Judges.

**CONVICTIONS AFFIRMED; SENTENCES AMENDED;
AND REMANDED WITH INSTRUCTIONS**

Asa A. Skinner, District Attorney
Terry W. Lambright, Assistant District Attorney
Vernon Parish
P.O. Box 1188
Leesville, LA 71446
Attorneys For the State of Louisiana

Edward K. Bauman
Louisiana Appellate Project
P.O. Box 1641
Lake Charles, LA 70602
(337) 491-0570
Attorney For R.K.

FACTS

On November 21, 2005, the Vernon Parish Grand Jury indicted R.K.,[1] (Defendant) on two counts of aggravated rape, violations of La.R.S. 14:42. After pleading not guilty, Defendant proceeded to trial on the merits. The jury found Defendant guilty as charged finding he had two minor children, under the age of thirteen, perform oral sex upon him. The victims were eight and nine years old respectively. On June 29, 2010, the trial court sentenced Defendant to serve life imprisonment for each conviction, each term to be served consecutively.

Defendant now appeals. For the reasons stated below we affirm the convictions and sentences with the exception that we amend Defendant's sentences to delete the provision regarding parole, noting Defendant is not eligible for parole and is not subject to the provisions of La.R.S. 14:43.6 which were not effective at the time Defendant committed these offenses in 2005. The trial court is instructed to note the amendment to Defendant's sentence in the court minutes.

**ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record we find there is one error patent.

After the trial court imposed the sentences of life imprisonment without the benefit of probation, parole, or suspension of sentence, the trial court stated, in pertinent part:

> [I] am aware that in the future . . . things may change . . . his sentence may somewhat change and Mr. [R.K] may become eligible for parole. If, in fact, that does occur I'm also ordering that Mr. [R.K.] be subject to Revised Statute 14:43.6 which is commonly known as the chemical

---

[1] Under La.R.S. 46:1844(W), the identity of minor victims are confidential. Therefore, this opinion will refer to the victims and all parties related to the minor victims by initials.

castration law. I will appoint the medical officer for the Louisiana Department of Correction to make the determination at the appropriate time, if that occurs, to make the appropriate determination of whether or not Mr. [R.K.] is medically fit for that treatment.

Louisiana Revised Statutes 14:43.6, effective June 25, 2008, provides, in pertinent part:

A. Notwithstanding any other provision of law to the contrary, upon a first conviction of R.S. 14:42 (aggravated rape), R.S. 14:42.1 (forcible rape), R.S. 14:43.2 (second degree sexual battery), R.S. 14:78.1 (aggravated incest), R.S. 14:81.2(E) (molestation of a juvenile when the victim is under the age of thirteen), and R.S. 14:89.1 (aggravated crime against nature), the court may sentence the offender to be treated with medroxyprogesterone acetate (MPA), according to a schedule of administration monitored by the Department of Public Safety and Corrections.

. . . .

B. (2) If the court sentences a defendant to be treated with medroxyprogesterone acetate (MPA), this treatment may not be imposed in lieu of, or reduce, any other penalty prescribed by law. However, in lieu of treatment with medroxyprogesterone acetate (MPA), the court may order the defendant to undergo physical castration provided the defendant file a written motion with the court stating that he intelligently and knowingly, gives his voluntary consent to physical castration as an alternative to the treatment.

C. (1) An order of the court sentencing a defendant to medroxyprogesterone acetate (MPA) treatment under this Section, shall be contingent upon a determination by a court appointed medical expert, that the defendant is an appropriate candidate for treatment. This determination shall be made not later than sixty days from the imposition of sentence. An order of the court sentencing a defendant to medroxyprogesterone acetate (MPA) treatment shall specify the duration of treatment for a specific term of years, or in the discretion of the court, up to the life of the defendant.

(2) In all cases involving defendants sentenced to a period of incarceration or confinement in an institution, the administration of treatment with medroxyprogesterone acetate (MPA) shall commence not later than one week prior to the defendant's release from prison or such institution.

(3) The Department of Public Safety and Corrections shall provide the services necessary to administer medroxyprogesterone acetate (MPA) treatment. Nothing in this Section shall be construed to

2

require the continued administration of medroxyprogesterone acetate (MPA) treatment when it is not medically appropriate.

(4) If a defendant whom the court has sentenced to be treated with medroxyprogesterone acetate (MPA) fails to appear as required by the Department of Public Safety and Corrections for purposes of administering the medroxyprogesterone acetate (MPA) or who refuses to allow the administration of medroxyprogesterone acetate (MPA), then the defendant shall be charged with a violation of the provisions of this Section. Upon conviction, the offender shall be imprisoned, with or without hard labor, for not less than three years nor more than five years without benefit of probation, parole, or suspension of sentence.

(5) If a defendant whom the court has sentenced to be treated with medroxyprogesterone acetate (MPA) or ordered to undergo physical castration takes any drug or other substance to reverse the effects of the treatment, he shall be held in contempt of court.

Louisiana Revised Statutes 14:43.6 was not in effect at the time Defendant committed the offenses in 2005 and is therefore inapplicable to Defendant.[2] Additionally, Defendant is ineligible for parole. *See* La.R.S. 14:42. Moreover, in *State v. Bradley*, 99-364 (La.App. 3 Cir. 11/3/99), 746 So.2d 263, this court explained that the power to regulate one on parole is vested in a parole board within the Department of Corrections and that a trial court has no authority to impose a condition on a parolee. *See also State v. Kotrla,* 08-364 (La.App. 3 Cir. 11/5/08), 996 So.2d 1224 *and State v. Franco,* 08-1071 (La.App. 3 Cir. 4/1/09), 8 So.3d 790, *writ denied*, 09-1439 (La. 2/12/10), 27 So.3d 843. Thus, the trial court lacked authority to impose this future condition of parole. Accordingly, this court amends Defendant's sentence striking the condition of parole with instructions to the trial court to note the amendment in the court minutes.

**ASSIGNMENT OF ERROR NO. 3:**[3]

---

[2]Louisiana Revised Statutes 1:2 provides: "No Section of the Revised Statutes is retroactive unless it is expressly so stated."

[3]"When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the

3

Defendant asserts, "The evidence presented at trial, when viewed in a light most favorable to the prosecution, was insufficient to sustain the convictions." Though the defendant concedes that, at a minimum, the victims testified he had them perform oral sex on him while they were under the age of thirteen, Defendant urges, "all of the elements of aggravated rape were never proven beyond a reasonable doubt." Defendant further complains this is because the accounts given by the victims "are so riddled with inconsistencies as to render them unreliable, untrustworthy and incredible." Defendant contends there were obvious motives for his ex-wife and her sister to make the accusations against him; and therefore, rational triers of fact could not believe they were telling the truth.

The State maintains the victims were reasonably consistent considering the five-year delay between the offenses and the trial. The jury had the opportunity to compare the victims' trial testimony with all of their prior statements given five years before the trial. The jury also had the opportunity to listen to Defendant's testimony, explanations, and denials before deciding who was more credible. Defendant does not allege the State's evidence does not satisfy the elements of aggravated rape as set forth by La.R.S. 14:42. Instead, he argues this court should not believe the State's witnesses because they were not credible and asserts the jury should have believed his denials and explanations.

It is not the function of the appellate court to reassess credibility of witnesses or reweigh the evidence:

> [The supreme court has] repeatedly cautioned that the due process, rational fact finder test of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), does not permit a reviewing court to substitute its own appreciation of the evidence for that of the fact finder or to second guess the credibility determinations of the fact finder necessary to render an honest verdict. A reviewing court may intrude on

sufficiency of the evidence." *State v. Hearold*, 603 So.2d 731, 734 (La.1992).

4

the plenary discretion of the fact finder "only to the extent necessary to guarantee the fundamental protection of due process of law."

*State v. Calloway*, 07-2306, p. 10 (La. 1/21/09), 1 So.3d 417, 422 (citations omitted).

"The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness[.]" *State v. Higgins*, 03-1980, p. 17 (La. 4/1/05), 898 So.2d 1219, 1232, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182 (2005). "Credibility determinations are within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence." *State v. Marshall*, 04-3139, p. 9 (La. 11/29/06), 943 So.2d 362, 369, *cert. denied*, 552 U.S. 905, 128 S.Ct. 239 (2007).

When M.M. testified at trial, she was thirteen years old; she was born in June 1996. M.M.'s cousin, T.P., was twelve or thirteen at the time of trial. M.M. recalled spending the night with T.P. and D.K. at Defendant's house. M.M. remembered telling her mother, A.C., about what happened at Defendant's home. M.M. had not reported the matter before because she promised Defendant she would not say anything. The topic came up because her school was having drug and sexual abuse awareness programs. When A.C. told M.M. that she needed to tell if something ever happened to her, M.M. told her what had happened. M.M. said she did not tell A.C. everything; she just told her about how she and T.P. had performed oral sex on Defendant. M.M. was nervous when she told her mother that Defendant had sexually abused her; her mother "freaked out" and drove M.M. to the police station in Leesville to report the matter.

M.M. testified the events happened over a school break when M.M. went to stay with her "NuNu;" once there, M.M. accompanied T.P. and D.K. to Defendant's house. They arrived at Defendant's house sometime in the afternoon. They put their things away and watched videos of the twin towers and Defendant showed them

5

"stuff" on the computer. At some point, Defendant told M.M. and T.P. to go take a bath. D.K. stayed in her room.

M.M. said she and T.P. took a bath together. Defendant joined them in the bathtub. He was not wearing clothing, and she and T.P. were also without clothes. Once Defendant was in the tub, Defendant instructed them to perform oral sex on him. M.M. stated:

> Because[,] like[,] on the way to his house and he was - - that's whenever he made us promise not to tell anybody anything[,] and I was sitting in the front seat[,] and [T.P.] and [D.K.] were in the backseat[,] and he was telling us about a contest he did[,] and[,] like[,] you could win money and stuff like that if you won[,] and he was[,] like[,] we have a very good chance of winning because I've got two of y'all here and stuff like that[,] and then whenever he was in the bathtub with us[,] he was[,] like[,] I want to see what y'all could do for the contest[,] and then that's when we did that.

M.M. explained they were going to be in a video or pictures which Defendant planned to take of them. Defendant did not tell them how much money they could win, but he promised to give them some of it and mentioned he would pay bills with the remainder. M.M. described what Defendant said to get them to perform fellatio on him, "he told us to do it and that[,] if we didn't do it[,] we weren't going to be in the contest[,] and we wouldn't get any money." M.M. saw T.P. also perform oral sex on Defendant and explained that she put her mouth on the part Defendant used to urinate, and it became harder and bigger. They each put their mouths on Defendant's penis once or twice. Defendant's body part went in and out of their mouths, and he moaned. After that, they got out of the bathtub, and Defendant told them to go put on little shirts. They each put on one of the T-shirts D.K. slept in with the shirts just covering their top halves. They were not wearing anything else.

M.M. explained that, after putting on the shirts, they went into the living room where Defendant was waiting with a video camera. Defendant had spread a blanket

6

on the floor in the middle of the room.  They sat on the couch until Defendant told them what to do:

> At first[,] he told us just to[,] like[,] get on our knees on the blanket[,] and then that's whenever we performed oral sex again[,] and then[,] like[,] after that[,] we kind of got out of range from the camera, I guess you could say[,] and then he kissed me[,] and he had this gel stuff, I don't know what it really was, and it was like in a bottle[,] and he put it on mine and [T.P.'s] behinds[,] and after that[,] like[,] he was laying on his back on the floor[,] and[,] like[,] his feet were closer to the t.v.[,] and he told me that [T.P.] had been doing this for a while so if I didn't want to[,] he would understand[,] and [T.P.,] like[,] went over there[,] and she got on him[;] like[,] her butt was on him.

M.M. elaborated that T.P. had put her "butt" on Defendant's private part. M.M. was scared, but T.P. did not act frightened.  The light on the video camera next to "rec" was blinking, which indicated it was recording.  Defendant was not holding the camera.  It was on a tripod.

M.M. next described what happened after T.P. put her bottom on Defendant's private part:

> She just kind of[,] like[,] sat there, I think, she kind of went up and down some and then, like, she stood up[,] and I don't - - then after that[,] we went[,] and we laid down on our backs on the blanket[,] and we were kind of like holding our legs[,] like[,] we were holding our feet[,] and he was sitting there[,] and he told us that we had to be really still then[,] and we just couldn't move, just be still so that the camera could get it or something like that[,] and he comed [sic] on us.

She explained that Defendant's white and gooey sperm came out of his private part and landed on their private areas.  Defendant had instructed them to be still, told them it would be good if he made himself happy, and rubbed himself.  The white stuff was slimy like algae on a fish; M.M. did not notice a smell, and she did not taste it. After Defendant ejaculated on them, Defendant told the girls to take a bath. M.M. said she also kissed Defendant, but it was not caught on tape.  Defendant put his tongue in her mouth during the kiss.  M.M. did not think Defendant kissed T.P.

M.M. said Defendant used his computer to explain about the contest:

7

He pulled up all these websites that he said nobody but a few people knew how to get to because they were illegal[,] and he showed us all these pictures from the websites and just stuff like that. He was telling us that we couldn't tell anybody about them or else he would get in a lot of trouble[,] and he couldn't see [T.P.] anymore.

. . . .

I saw pictures of kids with no clothes on with their parents right there or with their sisters right there[,] and somebody taking pictures of them, and, the one I remember the most was like this boy, he was laying on his back[,] and he has his mom and his sister beside him. He had like his mom on one side and his sister on the other side[,] and he was laying there just naked[,] and they had their hands on his[,] like[,] on his stomach and on his chest[,] and they took a picture of it.

These pictures were supposed to have been the other entries in the contest.

Following direct examination, the defense cross-examined M.M. trying to impeach her credibility. The defense asked questions about the timing of her first report and her mother bringing her to the police station. Defense counsel tried to get M.M. to say that she told her mother after A.C. had talked to her about Defendant; however, M.M. maintained what she said on direct examination. The defense asked M.M. if she had watched the video or read the transcript of her interview with Ms. Theus in preparation for trial. M.M. said she had not. Defense counsel also asked M.M. if she had spoken to the prosecutor before testifying. M.M. said he had advised her about what may happen, but he did not discuss what she had to say or the facts of the case.

The cross-examination of M.M. continued with defense counsel asking questions about particular statements M.M. made during her advocacy center interview. M.M. explained her statements. The defense also continued its inquiry into whether M.M.'s testimony was coached. Defense counsel pointed out that M.M. had not told Ms. Theus about the incident in the bathtub. M.M. explained that she had not thought the interview had been about what happened before they were in the

8

living room. The defense also attempted to get M.M. to state that she saw all of this on a video, but M.M. maintained that the only video involved was the one made by Defendant. Defense counsel pointed out further discrepancies between her earlier statements and M.M.'s trial testimony.

The defense continued attempting to show M.M. fabricated her testimony by asking if she had seen bad videos at her aunt's home or if she had ever walked in on her aunt having sex. M.M. maintained she had not been exposed to any such experiences. Defense counsel further inquired as to whether M.M. made any prior allegations of sexual abuse. M.M. denied reporting any such activity. M.M. thought it was around Christmas because she visualized a Christmas tree every time she thought about the episode.

On redirect examination, M.M. explained why she thought the incident had occurred around Christmastime. M.M. also elaborated on her other school breaks and said that spring break usually occurred sometime at the end of March or the beginning of April, and it did not always coincide with Easter. Upon the prosecutor revisiting facts that may have been muddled by the questions asked on cross-examination, M.M. clarified the information in a manner consistent with her testimony on direct examination. The State further questioned M.M. as to whether anyone, including the prosecution, had told her what to say at trial. M.M. denied receiving any instructions on what to say other than to tell the truth.

T.P. also testified at trial. At the time of trial, T.P. was thirteen years old. She recalled the events five years before which led to the accusations against Defendant. Those events happened sometime just after her eighth birthday in late March. She, M.M., and D.K. spent the night together at Defendant's trailer while they were on

summer or spring break. M.M. was visiting, and they all went to Defendant's home. His trailer had two bedrooms, and T.P. shared a room with her sister, D.K.

On that occasion, she recalled Defendant telling them to pause their video game and go into the living room, which also contained the kitchen and dining room. Defendant told them something about a website that they could not tell anyone, and he had them promise not to tell. When T.P. asked what would happen if they told, Defendant did not reply; he told them to wait until after D.K. went to sleep. After D.K. was asleep, they went back into the living room where Defendant was doing something on the computer. He told them to get ready for a bath. His computer was the desktop variety and was located in the kitchen. Defendant also had a big black camera between the hallway and the television. T.P. did not recall whether Defendant had a camera set up in his house that night, and she did not remember him telling her anything about using a camera to take pictures.

T.P. said that, once she and M.M. were ready for a bath, they had to sit in the bathtub and wait. When they were done with their bath, they were supposed to go back into the bedroom and get dressed like he told them. As they sat there, Defendant came in and got into the bathtub with them; he was not wearing any clothing. Defendant then told T.P. and M.M. to suck his private part and see how many times they could do that before choking. Defendant wanted each of them to do this. M.M. went first. She did what he told her to do, and Defendant counted how many times they went back and forth, in and out, without choking. Defendant's private area was in M.M.'s mouth. T.P. did the same thing after M.M. That was the extent of Defendant's contact with the girls in the bathtub. T.P. stated that they had bathed before this happened, and she did not recall whether they bathed again afterward.

10

T.P. said they put their pajamas on after their bath but she did not recall if that was how they remained dressed for the rest of the evening. At some time that night, they went back into the living room. Defendant had them remove their clothing; they were, again, wearing nothing. T.P. was not sure if Defendant had them wear D.K.'s clothing.

The prosecutor requested a bench conference to discuss T.P.'s state of mind. In the bench conference, the State said T.P. seemed to be having trouble inasmuch as she seemed to be confusing this specific incident with others involving Defendant. The State requested a break for the witness to calm down. The State feared it might appear to the jury that she was being untruthful when, in fact, this had happened to T.P. up to five times, so she could be confusing the occurrences. At two points prior to the bench conference, the prosecutor offered T.P. a break. The defense objected to a break. In response, the prosecution asked to lead the witness. The court suggested that the prosecutor ask T.P. whether this kind of thing had happened to her on more than one occasion and denied the request for a break.

After the bench conference, the prosecutor asked T.P. whether there were other occasions when she engaged in sex with Defendant. T.P. replied that there were, but she did not "remember what all was going on." T.P. said that Defendant did not tell them to take off their clothes, he just told them to lie down on the floor on their backs in front of the camera. It was a video camera set up on a three-legged stand being operated by Defendant. He told both T.P. and M.M. to lie on the floor; D.K. was asleep in her room with the television on. It was dark outside, nine or ten o'clock at night. T.P. said that, once she and M.M. were on the floor naked, Defendant got on his knees and became excited; his penis became hard. Defendant did not touch them

11

with his penis at that time. T.P. thought it happened before M.M. was there because it stopped after that.

T.P. further testified that she remembered speaking to someone at the Rapides Advocacy Center. During the second interview, T.P. answered questions about what Defendant did to her. In the first interview, T.P. was shown pictures of boys and girls and told to point out spots she had seen and that Defendant "had done." T.P. did not tell the interviewer about the bathtub until the second interview. For the second interview, her mother, S.G., promised to take her to Pizza Hut if she would answer all of the questions without being stubborn, rude, or mean. Her mother did not tell her what to say; she just told T.P. to answer the questions as best she could. It was easier to answer the questions the second time, but T.P. did not want to talk to anyone; she was sad, depressed, and felt that no one was there for her.

T.P. explained that she was not the one who told about Defendant. He was her step dad, and she did not want him to get into trouble. At that point, she did not really realize what he had done. She did not think he had done anything wrong. Defendant did not threaten her to keep silent. T.P.'s father died when she was two or three, and her mother tried to be both her mom and dad, but Defendant "kind of" tried to be a father to her. When she was eight, T.P. did not want Defendant to go to jail. T.P.'s mother asked her if anything had happened; she started the conversation by saying that, "apparently [M.M.] has told [A.C.]" T.P. did not really talk to her mother about the details. The first person she told about the details was the interviewer. At the time of trial, T.P. was speaking to her mother about what happened.

Returning to the events of that particular evening, T.P. said M.M. was lying to T.P.'s left and Defendant was in front of them. Defendant was by their feet; he was getting ready to "sperm," and he "jacked off" to make that happen. The sperm was

12

white, hot, and "liquidy." T.P. did not remember the smell or taste, and she did not remember telling the interviewer what it tasted like. The sperm hit both T.P. and M.M. on their chests and stomachs. She tried to tell the interviewer where the sperm went, but she thought the words did not "come out right." T.P. did not remember anything after Defendant ejaculated on them. According to T.P., the prosecutor did not tell T.P. what to say other than to tell the truth. T.P. maintained she had just told what she knew and kept it honest. T.P. repeated that she did not remember anything happening after Defendant ejaculated and it was the last time anything of the sort happened.

On cross-examination, the defense asked if she had seen some sexually explicit movies in her mother's house. T.P. responded that she had not at the time of the incident, but she has since, and if she told the interviewer, then it was probably true, but she did not remember telling the interviewer. T.P. did not walk in on her mother while she was having sex with her subsequent husband, T.N., but T.P. had walked in on her mother engaging in sexual activity with her current boyfriend. This type of thing had happened before the incident with Defendant. T.P. remembered at trial that the television was on in D.K.'s room. Although she told Ms. Theus several times that D.K.'s television was not on, she now remembered that it was.

Defendant also testified at trial. Defendant said that, during the course of his relationship with T.P.'s mother, he became T.P.'s father figure. They had a close relationship, and Defendant loved her. T.P.'s mother left him in 2004. In the divorce, Defendant received joint custody of both T.P. and D.K. He exercised his visitation rights as much as possible. At the time of his arrest, he was working for Cubic, a contractor with the federal government, for a year. The job required him to have a secret clearance, which required a background check.

13

Defendant stated that, in August 2005, he agreed to take T.P. and D.K. The girls stayed overnight, and about 6:30 the next morning their mother and her friend S.C. beat on the door and woke up everyone. They demanded he contact Ms. Blackwell and turn the girls over. Once he contacted Ms. Blackwell, she explained there had been some accusations made against him. Defendant turned the girls over to their mother. He denied doing any of the things of which he was accused: "These allegations are completely false. I mean, I seen a lot of conflicting stories that have been said, sitting over there at the table and keeping my emotions in check. There are a lot of things that - - they just don't jive even with the stories from everybody." Defendant denied taking nude and inappropriate photographs or videos of the girls.

Defendant said that T.P. and D.K.'s mother got the still photo camera in the divorce. He denied showing the girls inappropriate photographs. He acknowledged having a computer, but he stated that it had persistent problems; it was a piece of junk. Defendant claimed he set his computer to download music all day and when he came home from work, the screen was blue. A technician offered to get him "a replacement at [a] dirt cheap price." He testified that he removed the hard drive because the technician said it was broken. Defendant asserted he had cooperated with law enforcement from the beginning, told them the truth, and allowed a voluntary search and seizure. Defendant again denied doing anything to T.P. and M.M.

Defendant attributed any nervousness or jitteriness he might have shown after his arrest to not being able to smoke. He smoked over two packs a day for twenty years, and the Vernon Parish Jail had a no smoking policy. Defendant recalled having to go and get D.K. and T.P. from their mother's house on one occasion because they were left without supervision. M.M. had only been to Defendant's home once since his divorce with T.P. and D.K. There was no Christmas tree in the

14

living room at that time.  S.C. and her husband showed up to visit with M.M. while M.M. was at his home.   S.C. did not get along with A.C., so she was visiting M.M. when A.C. was not around.

Defendant said T.P. stayed in contact with him during her  and M.M.'s three-week visit at her grandfather's house in Alabama.  She called him two or three times. It was not unusual for T.P. to call him.  She called him the normal amount of times in the month leading up to his arrest.  Defendant said he owned a camcorder, but he denied owning a tripod or a still camera.  He testified he used his video camera to record holidays, weekends, outings, and memorable moments like the girls playing in a mud puddle.

On cross-examination, Defendant explained he had been videotaping maneuvers and training exercises at Fort Polk in the employ of Cubic for fourteen months prior to August 2005.  He used a government computer tied into the Fort Polk network for his job.  When Ms. Blackwell contacted him to take the girls, she did not tell him the reason over the phone.  When he arrived at OCS, she explained to him that there had been accusations against S.G., T.P.'s mother,  and T.N.

Defendant did not remember telling L.M. why his computer crashed. Defendant and L.M. dated for four or five months prior to that August.  He admitted that L.M. was not lying about him directing her to a website with a nude picture of him with an erection.  However, it was not a website; it was a picture on the internet. It could be located by browsing through pictures, but no one would know it was him unless he told them.  Defendant said he probably directed L.M. to other websites to view additional information about him.  He denied telling officers that his hard drive had been fried by a lightning strike; however, he may have mentioned a power surge. The entire area had been experiencing electrical problems that week. Defendant told

the officers he was sorry he discarded the hard drive and that he would not have done so if he knew it was important to their investigation. He was not arrested on that date.

Defendant said the police did not question him immediately upon his arrest but waited five days. He testified that he would not have been surprised if his demeanor during the interview on August 17, 2005, could have been described as very emotional and almost crying. Defendant did not remember asking them about his car, but he probably asked about having a television brought to him at the jail. He maintained the officers misconstrued what he said and took his statements out of context. He says that although he asked for a lawyer the officers continued to question him. Though Defendant acknowledged his signature appeared on the rights document marked S-1, he did not remember seeing or signing the rights form. Defendant again denied that anything sexual happened between him and T.P.

Defendant said he had been in jail for four years and nine months during the pendency of the case. He thought his memory was much the same as it had been in August 2005. He did not feel that the passage of time affected his recollection of events. He did not remember the name of the technician who helped him, but the company Defendant worked for should have had a record of the name. He recalled the technician was a service man for a company in DeRidder. Defendant denied knowing of any incidents where T.P. might have seen inappropriate photographs at his home. He denied ever talking to M.M. and T.P. about a contest, and he denied ever taking a bath with the girls. He said he did not even go in "there" when they were bathing. Defendant also denied telling the officers who searched his home that his hard drive had been destroyed by a thunderstorm that happened a week or two before the search.

On redirect examination, Defendant said he had posted the naked photo of himself for L.M., but it did not "go over too hot." Instead, it was embarrassing. Defendant had posted a second photograph of himself on the internet fully clothed with information about him. Defendant said he voluntarily turned himself in to police for arrest as soon as he was able to leave work.

Because both the victims and Defendant testified at trial, the jury had the opportunity to observe the demeanor of all parties. As the advocacy center interviews were played for the jurors, they had the ability to compare and contrast the victims' testimony with their prior statements. The defense cross-examined both girls concerning discrepancies between the prior statements and their testimony. Defense counsel also had the opportunity to point out the differences between the victims' accounts of the events.

Both girls testified consistently about the events that occurred in the bathtub. They both said Defendant had them perform oral sex on him when they were about eight years old. Both testified consistently that Defendant had them lay on their backs in the living room while he masturbated and ejaculated onto them. The discrepancies in what the victims reported wearing and whether or not T.P. engaged in anal sex with Defendant or a second bout of oral sex during the incident in the living room can be easily attributed to T.P.'s confusion of facts given that this happened to T.P. multiple times, and to M.M. only once.

Though there was a discrepancy in the witnesses' statements about the timing of the offense; M.M. said she thought it happened around Christmas because she pictured a Christmas tree when she recalled the incident; she did not state that there was a Christmas tree in Defendant's living room at the time of the offense. Clearly,

17

a rational trier of fact could have found the victims were more credible than Defendant. Such a finding was not clearly contrary to the evidence.

Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 1:

Defendant argues, "The trial court erred in denying defendant's Motion in Limine in part and granting it in part." Defendant asserts the motion in limine sought the suppression of website information which included the names of the sites ("I Like Them Young" and "I Ain't Right") as well as the two personal photographs he posted on the websites (one of Defendant nude and one of him fully clothed ). Defendant asserts the trial court erred in ruling his nude photo admissible.

Defendant alleges the State failed to present evidence that he had directed either of the victims to the website showing the image of Defendant with an erection but only presented evidence that Defendant asked his girlfriend to view the photo. Defendant contends, therefore, the evidence was irrelevant as it did not show Defendant had a lustful disposition toward children and was highly prejudicial as the jurors might be offended by internet pornography.

The State responds that it was not error, and, if it was, it was harmless. The prosecution was attempting to show that Defendant used the internet and the photos posted on the internet as part of his method or scheme for showing his victims that it was okay and normal to perform these acts and post pictures thereof on the internet. The trial court found the internet photos were relevant because the victims testified that Defendant took their pictures to post on the internet.

The State contends that, even if it was error, it was harmless beyond a reasonable doubt. Defendant urges the jury could have been prejudiced but fails to point out any actual prejudice to his case. At trial, the defense objected to the

18

evidence on the grounds that it was not relevant to the aggravated rape charges.

Defense counsel urged that the photograph served only to make Defendant look bad.

> My understanding is the[y']re wanting to get in that [Defendant] was on the computer, one photo fully clothed, one photo nude. Now, in the wildest stretch of my imagination[,] I'm trying to establish some connexity [sic] for relevance between a photo of my client on the Internet. If you take away or if you consider the fact that there is no connexity [sic] and no relevance then you come up with[,] well, the only thing it can do is the nude photo can prejudice [Defendant] with the jury because it does nothing to show he has a lustful disposition for children under the age of thirteen, it does nothing to prove any link between these allegations and accusations being made against him. It's simply not relevant. You can't connect the dots on this one.

The prosecution responded that the evidence went to show that Defendant employed the internet photographs as part of his method of seduction:

> [I]t is apparent that the Defendant's means of operating, the way he went about seducing these young girls to be able to do the things that he did with them was by presenting an environment, if you will, that allowed them to be comfortable with his view of sexuality to show that other people engaged in these kinds of acts and made more common place the fact that occurrences such as his own image on the Internet nude, the images of other adults and children on the Internet nude, the reference to the website that [D]etective Bailey provided us a printout on which is also a part of our discovery, I believe something like Fathers and Daughters, I believe that was the name of that website, it's part of the record in discovery. All of these pieces are interrelated and connected towards demonstrating his intent to present himself and his home as a place where this kind of conduct is quite acceptable.

The prosecution went on to say that it wanted to show that L.M.'s daughter would have been Defendant's next victim. The State conceded that, without allowing the title of the website "I Like Them Young" or any background information about the site, it was harder to establish the relevance of the photograph showing Defendant fully clothed.

The defense protested that there was no evidence that Defendant asked either of the victims in the instant case to view those particular images or that Defendant

19

ever targeted L.M.'s daughter as a victim. Defense counsel continued to assert that the State simply wanted to use the photographs to show he was a bad person.

As noted, the trial court found the information that Defendant posted naked pictures of himself on the internet was relevant because the victims said he was going to take pictures of them to post on the internet:

> Alright. This is my ruling, again, the information concerning the website where he is fully clothed is irrelevant. The other site, without the name being mentioned of either of these sites, is relevant. There was some testimony from the girls to the [e]ffect that he was taking their pictures to perhaps put on the website or at least the t.v., Internet to some extent is my understanding. I think that would, to some degree, make that relevant.

Following the trial court's ruling, the State called L.M. to testify. She stated she dated Defendant in 2005. During the beginning of their relationship, they spoke frequently over the telephone. As the relationship progressed, they began spending the night with each other. In 2005, L.M. had a five-year-old daughter who lived with her. At the time, L.M. also knew Defendant's daughter, D.K., and stepdaughter, T.P. During their acquaintance, she visited an internet website at Defendant's request. On the website, L.M. saw erect male genitalia; at the time, she did not know it was Defendant's because the picture did not show the man's face. This was the only information posted at that website. She had not known what was on the webpage before she viewed it. When she asked Defendant about it, he said that it was him and that he had put it there for her to see.

L.M. stated that, during their relationship, T.P. and D.K. stayed with Defendant occasionally, including entire weekends. During the summer, L.M. learned of some kind of problem going on in the home of Defendant's former wife and her husband. L.M. met Defendant at child services, and child services gave Defendant custody of D.K. T.P. had been staying with her grandfather in Alabama, but she was en route

home. When she returned from Alabama T.P. went to stay with Defendant, too. The children stayed the night with Defendant; and their mother, accompanied by Child Protective Services, picked them up the next morning.

L.M. testified she was aware that Defendant had a computer as well as a small handheld camcorder. She thought she may have used Defendant's camera once, and she used his computer twice. Defendant's desktop computer was in the kitchen. Defendant occasionally spent a lot of time on the computer, mostly in the mornings. Defendant said he was downloading pictures. She testified that he later told her his computer had contracted a virus and crashed. The defense declined to cross-examine L.M.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La.Code Crim.P. art. 401. "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation. Evidence which is not relevant is not admissible." La.Code Evid. art. 402.

As noted above , M.M. testified Defendant showed both her and T.P. nude pictures on the internet when he was discussing the contest in which he wanted them to participate. Thus, the evidence that Defendant directed L.M. to a nude photo of himself with an erection, while they were dating, when considered with M.M.'s testimony, tends to support the State's position that Defendant used naked pictures on the internet to facilitate his sexual seductions. *See* La.Code Evid. art. 404(B).

Even assuming *arguendo* that the evidence was inadmissible it does not constitute reversible error unless it affected a substantial right. "Error may not be

21

predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected and . . . a timely objection or motion to admonish the jury to limit or disregard appears of record, stating the specific ground of objection[.]" La.Code Evid. art. 103(A)(1). "A judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused." La.Code Crim.P. art. 921.

The second circuit has discussed the standard for determining whether an erroneous admission of evidence affects a substantial right of the Defendant:

> This court has both the authority and the obligation to review the record de novo to determine an error's harmfulness. In doing so, we begin with the premise that the other lawfully admitted evidence is sufficient to support the jury's verdict. The task of the reviewing court conducting a harmless error analysis is to determine whether the error contributed to the verdict or whether the force of the evidence presumably considered by the jury in accordance with the instructions of the court is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the error.

*State v. Jetton*, 32,893, p. 6 (La.App. 2 Cir. 4/5/00), 756 So.2d 1206, 1213, *writ denied*, 00-1568 (La. 3/16/01), 787 So.2d 299 (citations omitted).

In the instant case, we cannot say the verdict at trial was attributable to evidence showing Defendant asked his girlfriend to look at a naked picture of him with an erection on the internet. The evidence presented by the victims in this case was more than sufficient to satisfy the elements of La.R.S. 14:42. Though the information may have supported M.M.'s credibility concerning events leading up to the offense– the seduction phase, her credibility regarding the pertinent facts, such as oral sex in the bathtub, were supported by T.P.'s testimony and prior statements given by both victims.

Accordingly, this assignment of error is without merit.

22

**ASSIGNMENT OF ERROR NO. 2:**

Defendant claims his trial counsel was ineffective in his representation because defense counsel failed to object to the trial court's failure to rule on his motion for mistrial. The defense attorney objected when the State asked Defendant if S.G. had broken up with him because she discovered websites, such as "Daughters and Daddies," on their computer. Though the Defendant's lawyer moved for a mistrial, argued the evidence was irrelevant, and contended it was so prejudicial it warranted a mistrial, the district court did not rule on the motion for mistrial. Instead, it ruled the evidence was irrelevant.

Defendant also claims his trial counsel was ineffective for failing to object to what he refers to as repetitive hearsay evidence presented by Anna Theus and Deputy Mike Martin. Defendant asserts this does not fall within a hearsay exception because their testimony did not constitute initial reports under La.Code Evid. art. 801(D)(1)(d). He further argues that Ms. Theus should not have been allowed to testify regarding the children's statements given at the Rapides Parish Child Advocacy Center because they were not given for the purposes of medical treatment under La.Code Evid. art. 803(4) but were conducted as forensic interviews to determine whether the children had been sexually abused.

Defendant asserts that competent trial counsel would have objected to these matters and that the failure to object cannot be considered trial strategy. Defendant urges that the line of questioning asked Defendant's ex-girlfriend was highly prejudicial and severely undermined the defense by showing Defendant was an "internet pervert whose wife left him because of his feelings towards young children." Additionally, Defendant complains the testimony of Ms. Theus and Deputy Martin was not harmless or merely cumulative because it bolstered the victims' credibility.

23

Defendant professes that, but for defense counsel's failure to object, Defendant may have never been convicted. Based on these arguments, Defendant requests this court vacate his convictions and sentences and remand the matter to the trial court for further proceedings.

This court has held that ineffective assistance of counsel claims must meet two separate criteria in order to be valid:

> The right of a defendant in a criminal proceeding to the effective assistance of counsel is constitutionally mandated by the Sixth Amendment of the U.S. Constitution. In order to prove that counsel was ineffective, the defendant must meet the two-pronged test enunciated by the Supreme Court. First, the defendant must show that counsel's performance was deficient. Second, the defendant must show that this deficiency prejudiced the outcome of the trial. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Brooks*, 505 So.2d 714 (La.1987), *cert. denied*, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). To establish a claim of ineffective assistance of counsel, a defendant must demonstrate that his defense attorney failed to meet the level of competency normally demanded of attorneys in criminal cases. *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Fickes*, 497 So.2d 392 (La.App. 3 Cir.1986), *writ denied*, 515 So.2d 1105 (La.1987).

> In considering allegations of ineffectiveness, defense attorneys are entitled to a strong presumption that their conduct fell within the broad range of reasonable professional assistance. The United States Supreme Court has held that the benchmark for judging a charge of ineffectiveness is whether the attorney's conduct so undermined the proper functioning of the adversarial process that the trial cannot be considered to have produced a just result. *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984); *Strickland*, 466 U.S. 668, 104 S.Ct. 2052.

> It is not enough for an accused to make allegations of ineffectiveness; the accused must couple these allegations with a specific showing of prejudice. *State v. Brogan*, 453 So.2d 325 (La.App. 3 Cir.), *writ denied*, 457 So.2d 1200 (La.1984). A claim of ineffective assistance of counsel may be disposed of based upon a failure to satisfy either criteria of the established two-pronged test; if the accused's claim fails to satisfy one, the reviewing court need not address the other. *State v. James*, 555 So.2d 519 (La.App. 4 Cir.1989), *writ denied*, 559 So.2d 1374 (La.1990). A brief review of the defendant's complaints against his attorneys will demonstrate the deficiency of his arguments.

24

*State v. James*, 95-962, pp. 4-5 (La.App. 3 Cir. 2/14/96), 670 So.2d 461, 465. Moreover, "[i]t is not sufficient for the defendant to show the error had some conceivable effect on the outcome of the proceedings. Rather, he must show that but for counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have been different." *State v. Jones*, 33,657, p. 11 (La.App. 2 Cir. 8/23/00), 765 So.2d 1191, 1199, *writ denied*, 00-2779 (La. 6/29/01), 794 So.2d 825.

*State v. Beaudoin*, 09-440, p. 15-16 (La. App. 3 Cir. 12/23/09), 27 So. 3d 342, 353.

Trial strategy is not grounds for finding ineffective assistance of counsel even though another attorney might have taken a different approach:

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.

Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or

omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Strickland*, 466 U.S. at 689-90, 104 S.Ct. at 2065-66 (citations omitted).

Defendant complains that his trial counsel was ineffective for not having the district court rule on his motion for mistrial made after the State raised the issue of the "Daughters and Daddies" website during trial. The exchange occurred as follows:

Q.    Are you familiar with a website called Daughters and Daddies?

A.    No.

Q.    You are not familiar with that?

A.    Not at all.

Q.    Wasn't there toward the end of your marriage with [S.G.], isn't that one of the reasons why you and she separated was that she had discovered what she believed . . .

BY MR. JONES:

Objection, Your Honor, may we approach?

BY THE COURT:

You may.

(BENCH CONFERENCE)

BY MR. JONES:

That didn't come out at any time, there isn't any information about this, we haven't been provided with any discovery on it[,] and the name - - the question itself is prejudicial enough to entitle me to a mistrial[,] and we could ask for it right now.

BY MR. KRAMAR:

26

It was disclosed in discovery, it's part of Kerri Blackwell's report of her interview with [S.G.]

BY MR. JONES:

That doesn't make it relevant[,] and that doesn't make it not prejudicial.

BY THE COURT:

You didn't ask Ms. Blackwell about it at all.

BY MR. JONES:

You didn't ask [S.G.] about it.

BY MR. KRAMAR:

No sir, but, I don'[t] know why I couldn't ask him about it. I mean, his explanation for it was these things were pop ups, this was part of the reason why, even though she had that suspicion, she allowed them to continue to visit[,] and I'm sure he can explain that to us as well.

BY MR. JONES:

Judge, we have a pretty error free record up to now, he is treading on thin, thin ice. I want to be heard on this out of the presence of the jury.

BY THE COURT:

I'm going to grant your objection, I don't think that it's even relevant at this time.

BY MR. JONES:

Yes, sir.

This colloquy shows the defense did not request a mistrial but merely stated that it could request a mistrial.

Under La.Code Crim.P. art. 770, mistrial must be ordered under certain circumstances:

Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:

27

(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;

(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;

(3) The failure of the defendant to testify in his own defense; or

(4) The refusal of the judge to direct a verdict.

An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

The prosecutor's question did not constitute a mandatory ground for mistrial under La.Code Crim.P. art. 770.

Under the provisions of La.Code Crim.P. art. 771, the Defendant may request an admonishment or may move for a mistrial if he asserts that an admonition will not be sufficient.

In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:

(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or

(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.

In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

Defense counsel did not ask for an admonishment nor did he move for a mistrial. Instead, he was satisfied that the trial court sustained his objection to this line of testimony and that the judge stated that this evidence was not relevant. The

28

decision by trial counsel not to pursue a motion for mistrial did not constitute a deficient performance.

This argument is without merit.

MS. THEUS'S TESTIMONY:

Defendant asserts that his trial attorney was ineffective for failing to object when Anna Theus testified concerning the victims' prior statements. The State responds that Ms. Theus's testimony was not a basis for finding defense counsel ineffective because Ms. Theus was obviously called to establish the foundation for introducing the victims' taped interviews into evidence. The State maintains her testimony was admissible in accordance with La.R.S. 15:440.1 et seq.

At trial, Ms. Theus began her testimony by detailing her work background, explaining the nature of the Children's Advocacy Center, and speaking about her involvement in the case. Ms. Theus continued by explaining the interview process. As correctly noted by the State, her direct examination reveals no hearsay testimony. Review of her redirect examination by the State does not show any hearsay statements by either the prosecutor or Ms. Theus.

All of the alleged hearsay information was brought up during cross-examination. After Ms. Theus further explained the interview process, including what statements or language she would use when speaking to the children she interviewed, defense counsel asked Ms. Theus whether she remembered both child victims stating during their interviews that there was another child in the house at the time of the offenses. Ms. Theus answered that she remembered this fact. The defense responded by asking Ms. Theus why she had further inquired about the third child's location during an interview with one of the victims but not the other. Ms. Theus explained it was not her practice to introduce someone the victim did not mention.

29

In response to defense counsel's request for further elaboration about the interview process, Ms. Theus explained how child victims were questioned. During the discourse, defense counsel brought up specific segments of the questions asked by Ms. Theus and the answers given by the victims as a means to inquire into the specific manner in which the interviews were handled. Ms. Theus responded to those questions. Her explanations sometimes included answers given by the victims during the interviews. The defense also inquired into the background information provided to Ms. Theus before the interview, including whether Ms. Theus was given information that the children may have seen their mother having sex with someone not their father. Thus, any hearsay information on cross-examination was either provided by defense counsel in questioning Ms. Theus or was elicited by defense counsel.

Additionally, in objecting to having the interview tapes played for the jury, defense counsel later indirectly explained the point of his line of questioning:

> I want to renew that objection that these statements don't comply with the requisites laid out by the cases that prohibit this type of activity and particularly Title 15 Section 440.5[,] and there are leading questions in there[,] and the statements aren't worthy of trust because of repetitive questioning[,] and I would call specifically to the record [of] my cross examination of Anna Theus and those reasons outlined in that cross-examination.

The defense's line of questioning was clearly trial strategy to show that Ms. Theus had led the victims to certain statements, that she had an inadequate factual knowledge upon which to question the children, and that her method of questioning the victims was inconsistent and, therefore, unreliable. Accordingly, Defendant's assertion that his trial lawyer was ineffective for failing to object to the hearsay contained in Ms. Theus's testimony is without merit; any failure by trial counsel to

30

object did not constitute a deficient performance but was in fact, part of defense counsel's trial strategy to discredit Ms. Theus' testimony.

<u>DEPUTY MARTIN'S TESTIMONY</u>:

Defendant also claims his trial attorney was ineffective for failing to object to alleged hearsay testimony given by Deputy Mike Martin of the Vernon Parish Sheriff's Office. Deputy Martin's brief testimony was submitted for the purpose of showing how the complaint process began. Any hearsay testimony by Deputy Martin was elicited by the defense in a clear attempt to discredit Deputy Martin and the child victims.

On direct examination, Deputy Martin testified he became involved in investigating the accusations against Defendant when A.C. brought her daughter, M.M., into the sheriff's office:

> August 5th, 6th, somewhere in that area there. The victim was brought in by her mother. She stated that she had been talking to her daughter - - there had been some accusations made about a family member, some sexual accusations, and she had spoken to her daughter and asked her, you know, if anything had ever happened to her and if it had that she could come to her mama and let her know that this had happened. That's when, you know, her daughter, which is a victim, told her mom what had happened to her.

Deputy Martin said A.C. was upset and crying while reporting what M.M. told her. Deputy Martin explained he spoke with M.M. before referring the matter to a detective.

The defense began cross-examination by asking whether M.M. indicated to him that Defendant penetrated her with his finger or penis. Deputy Martin said M.M. indicated she was penetrated by Defendant's finger. Defense counsel then asked whether M.M. said she saw Defendant penetrate T.P. with his penis, and Deputy Martin answered that M.M. had so stated.

31

On redirect examination, the prosecution asked whether M.M. said she saw the penetration or believed penetration had occurred because of a face made by T.P. Deputy Martin reviewed his report and said M.M. reported that the penetration occurred and that T.P. made an awful face. The State asked what M.M. said in addition to that about penetration between Defendant and M.M. or T.P. Deputy Martin responded that M.M. said Defendant put a jelly-like substance on her rectum before inserting his finger there. When asked when this would have occurred, Deputy Martin replied he had been advised that it happened over spring break in either late March or early April. On recross-examination, defense counsel asked Deputy Martin whether his report contained a specific statement by the victim. Deputy Martin agreed his report contained that language.

Deputy Martin's statement on direct examination of how and why A.C. brought her daughter in to file a complaint contained many references to what A.C. or M.M. said. Those statements included the information about how and why M.M. reported the matter to her mother, the fact that M.M. was a victim, and the information that there were some sexual accusations. "[I]f the inadmissible hearsay evidence is merely cumulative or corroborative of other testimony adduced at trial, its admission is considered harmless." *State v. Howard*, 04-499, p. 7 (La.App. 3 Cir. 11/17/04), 888 So.2d 375, 382, *writ denied*, 04-3216 (La. 4/8/05), 899 So.2d 13. This information was cumulative and did corroborate testimony at trial. M.M. addressed all of these topics during her testimony as did A.C. Any failure by trial counsel to object to this evidence did not constitute a deficient performance.

Much of the hearsay evidence was elicited by the defense on cross-examination. Defense counsel's actions in eliciting hearsay evidence was, once again, clearly trial strategy. Defense counsel sought to impeach M.M.'s testimony by

32

showing that she had not consistently reported that Defendant had penetrated her anus with his finger or that she saw Defendant penetrate T.P.'s anus. Thus, Defendant's attorney did not err in refusing to object to the testimony he elicited.

The State elicited hearsay testimony on redirect examination. In *State v. Taylor*, 93-2201 (La. 2/28/96), 669 So.2d 364, *cert. denied*, 519 U.S. 860, 117 S.Ct. 162 (1996), the defense claimed the trial court erred in allowing the hearsay statements of a police detective in the form of a police report. Noting that the defense cross-examined the officer about the report, the supreme court found any error to be harmless:

> We pretermit consideration of whether the report qualifies as hearsay under La.Code Evid. art. 803, because any error in admitting the report was harmless. It was the defendant that initially elicited testimony about the report, and who proceeded to extract from the witness his statement that he recorded the report "in his words" and without any "typographical quote from a typewriter on there."

(citations omitted)[4].

In *State v. Steward*, 483 So.2d 155, 157 (La.App. 4 Cir. 1986), the defendant also claimed the trial court erred in allowing hearsay by a police officer. The officer's testimony on direct examination included the information that he was assigned to investigate the incident and had arrived on the scene while the defendant was still in the custody of the officer who initially arrested him. *Id*. On cross-examination, the defense asked if the defendant requested the officer interview a specific person and whether the officer interviewed that person. *Id*. On redirect, the prosecution asked about the defendant's advisement of rights, what else he said at the time he asked the officer to interview the specific witness, whether the officer interviewed the witness, and what the witness said. *Id*. The fourth circuit held that the State's line of questioning on redirect was proper:

---

[4]This language appears in an unpublished appendix to the opinion.

33

> This is precisely why such a question is allowed. Once the defense opens the door in cross examination on a subject[,] it becomes a proper subject for redirect. The defense may not approach a prohibited area, make misleading statements about what is present there, and then close the door to clarification by the state.

*Id.*

Thus, defense counsel's questions on cross-examination opened the door for Deputy Martin's testimony on redirect examination concerning Defendant's anal penetration of the victims. Therefore, Defendant's trial attorney did not err in declining to object to the evidence.

Although Deputy Martin also stated he was advised the offenses occurred in late March or early April, which subject was not broached on cross-examination, this information came into evidence through other testimony. Under *Howard*, the evidence was cumulative and, therefore, harmless. Because an objection to this evidence would have had no effect, any failure of Defendant's attorney to object to this evidence did not constitute a deficient performance.

Accordingly, any failure by Defendant's trial attorney to raise a hearsay objection in connection with Deputy Martin's testimony did not constitute a deficient performance.

For the reasons stated above, Defendant's convictions are affirmed. We amend Defendant's sentences deleting the provision regarding La.R.S. 14:43.6 and note additionally that Defendant is ineligible for parole. The trial court is instructed to note the amendment in the court minutes.

**CONVICTIONS AFFIRMED; SENTENCES AMENDED, AND REMANDED WITH INSTRUCTIONS**

34